Filed 5/1/13 (unmodified opinion attached)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
) S190713
      v. )
) Ct.App. 4/3 G040716
COLE ALLEN WILKINS, )
) Orange County
      Defendant and Appellant. ) Super. Ct. No. 06NF2339
_____)

## MODIFICATION OF OPINION

THE COURT:

The opinion in this matter filed on March 7, 2013, and appearing at 56 Cal.4th 333, is modified as follows:

On page 351, footnote 6 is modified to read as follows: "The Court of Appeal held that the evidence was sufficient to support defendant's conviction and we declined to review that issue. Consequently, there is no bar to defendant being retried for felony murder. (See *People v. Hernandez* (2003) 30 Cal.4th 1, 6.)"

This modification does not affect the judgment.

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S190713 |
| v. | ) | |
| | ) | Ct.App. 4/3 G040716 |
| COLE ALLEN WILKINS, | ) | |
| | ) | Orange County |
| Defendant and Appellant. | ) | Super. Ct. No. 06NF2339 |
| _____ | ) | |

Defendant Cole Allen Wilkins was convicted of first degree murder under a felony-murder theory that the victim was killed during the commission of a burglary. The evidence at trial established that defendant burglarized a house under construction and loaded some large household appliances onto the back of a pickup truck. Sometime later, as he was driving on a freeway, an unsecured stove stolen in the burglary fell off his truck. Another driver swerved to avoid the stove, crashed into a large truck, and was killed. The trial court instructed the jury that in order for the felony-murder rule to apply, the burglary and the act causing the death must be part of one "continuous transaction." (See CALCRIM No. 549.) It refused defendant's request that the jury be instructed that, for purposes of felony murder, the felony continues only until the perpetrator has reached a place of temporary safety. (See CALCRIM No. 3261.) The Court of Appeal found no error in the trial court's refusal to instruct the jury on the so-called "escape rule" and affirmed.

1

We conclude that it was error to refuse the instruction on the escape rule and that the error requires reversal of defendant's conviction.

## FACTS

In 2005, defendant entered into an arrangement with a former girlfriend, Kathleen Trivich, under which she purchased a piece of property in Palm Springs and defendant, as co-owner, was to oversee the construction of a house on that property. Trivich also purchased a truck for defendant's use, but the title remained in her name. Defendant lived in Long Beach with his girlfriend Nancy Blake.

In 2006, Dennis Kane was building a home in Menifee, a city in Riverside County located roughly between Long Beach and Palm Springs. Kane had purchased a large number of appliances and other items for the house, including a stove, refrigerator, dishwasher, microwave, light fixtures, ceiling fans, door locks, and a sink. These items were last seen in the house about 8:00 p.m. on the evening of Thursday, July 6, 2006, when Kane's brother-in-law locked up the house.

Trivich testified at trial that on Friday, July 7, 2006, she twice spoke to defendant on the phone. The first time, at 12:45 a.m., he told her that he "got some big items for the kitchen." He did not tell her exactly what the items were. The second time, at 1:12 a.m., he told her that he was on his way to Palm Springs.

Shortly before 5:00 a.m. on Friday, July 7, 2006, defendant was driving Trivich's pickup truck westbound on "the 91 freeway" just east of the Kraemer Boulevard exit in Anaheim. He was travelling about 60 to 65 miles per hour, heading in the direction of his home in Long Beach. He was about 62 miles northwest of the Kane home in Menifee. The bed and cab of the pickup truck were loaded with appliances that had been stolen from the Kane home. The tailgate of defendant's truck was down and none of the items in the bed of the truck were tied down.

2

A stove fell off defendant's truck onto the 91 freeway. A driver behind defendant's truck, Danny Lay, struck the stove with his car. Lay attempted to get defendant to pull over by flashing his lights and honking his horn. Defendant slowed down and pulled over, but then accelerated again. Lay pulled up next to defendant's truck, rolled down the window, and told defendant to get off the freeway. Defendant pulled over at the next exit and stopped. He got out of the truck and threatened Lay, but when Lay told him that something had fallen off his truck, defendant exclaimed, "Oh my God, it's a thousand-dollar stove."

Defendant falsely told Lay that his name was Michael Wilkins. He gave Lay the name of the registered owner of the truck, Kathleen Trivich, but gave him several false telephone numbers. Defendant then continued on to his home in Long Beach. In the meantime, the stove was still on the four-lane 91 freeway, in either the fast lane or the lane just to the right of it. At 5:00 a.m., David Piquette, driving his car in the fast lane, suddenly swerved to the right, apparently to avoid hitting the stove. His car crossed the middle lanes and struck a big rig truck that was travelling in the far right lane. Piquette died.

When defendant arrived home in Long Beach about 5:30 or 6:00 a.m. on Friday, July 7, 2006, he and his girlfriend, Nancy Blake, moved some of the stolen items into Blake's trailer. The next day, he and Blake dropped the trailer off for repairs in Riverside, and drove the truck with the remaining stolen items to the home of defendant's friend, Sean Doherty, in Palm Springs. They used the tiedowns that were kept in the pockets of the backseat of the truck to secure the load in the truck bed. Defendant stored the remaining items in Doherty's garage.

That same Friday morning, between 7:00 and 7:30 a.m., Kane received a telephone call advising him that the appliances were missing from his house in Menifee, and reported the matter to the police. The police subsequently recovered

3

the items from Nancy Blake's trailer and Sean Doherty's garage, and arrested defendant.

To trace defendant's whereabouts, cell phone records were used. Cell phone company records indicated, in relevant part, that defendant made or received calls on his cell phone at 10:13 p.m. on Thursday night, July 6, 2006, and at 12:45 a.m., 1:12 a.m., and 4:30 a.m. on Friday morning, July 7, 2006. These records showed which cell tower transmitted each call. Normally, a cell phone call is transmitted through the closest tower, which would be located between two and 10 miles away from the caller's location. Thus, defendant's location at the time of the calls must have been within a few miles of the cell tower that transmitted each call. The 10:13 p.m. call was transmitted through a tower close to defendant's home in Long Beach. The 12:45 a.m. call was transmitted through a tower located near the 91 freeway, east of Long Beach. The 1:12 a.m. call was transmitted through a tower approximately 10 miles farther east. The 4:30 a.m. phone call was transmitted through a tower located near Riverside, and near the intersection of the 91 freeway and "the 215 freeway." The Riverside tower was about 31 miles north of the scene of the burglary in Menifee, and 31 miles east of the location where the accident would occur a half-hour later.

There was, however, no direct evidence of when the burglary took place. The prosecution's theory was that when the cell phone calls were made to Trivich at 12:45 a.m. and 1:12 a.m., defendant was driving eastbound on the 91 freeway, en route from his home in Long Beach to the Kane home in Menifee. After Trivich's truck was loaded with the appliances, under the prosecution's theory, at about 4:00 a.m. defendant got on the 215 freeway — which was the closest freeway to the Kane home — and drove north, placing him about 30 miles from Menifee at the time of the 4:30 a.m. call. He then took the westbound 91 freeway

4

where, half an hour and another 30 miles later, the accident occurred that killed Piquette.

Defendant testified in his own defense. He denied the burglary and testified that he did not take the appliances from the Kane home but that he bought them from an acquaintance named "Rick" at a Home Depot parking lot off the 91 freeway. After obtaining the appliances he drove eastbound on the 91 freeway toward Palm Springs, intending to leave the appliances at Sean Doherty's house. However, Doherty was not at home and defendant discovered that he could not unload them safely by himself, so he went into the house and took a nap. A couple hours later, he drove back to Long Beach, with the appliances still in his truck. Around 4:30 a.m. he pulled off at a gas station and used a pay phone to call his own cell phone because he could not find it in the truck. After locating his cell phone, he called Nancy Blake to inform her he was coming home.

**DISCUSSION**

**1. The Escape Rule**

Defendant was convicted of first degree murder under the felony-murder theory that the killing of David Piquette occurred in the commission of a burglary. The felony-murder rule provides that "[a]ll murder . . . which is *committed in the perpetration of*, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, [or] train wrecking . . . is murder of the first degree." (Pen. Code, § 189, italics added.) "Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction. [Citation.] This transaction may include a defendant's flight after the felony to a place of temporary safety." (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) "A killing committed by a robber during his or her flight

5

from the scene of the crime, and before reaching a place of temporary safety, comes within section 189." (*People v. Pulido* (1997) 15 Cal.4th 713, 723, fn. 3, citing *People v. Salas* (1972) 7 Cal.3d 812, 820-824.)

This principle, often referred to as the "escape rule," originated in *People v. Boss* (1930) 210 Cal. 245, in the context of a felony murder in the perpetration of a robbery. *Boss* noted that "[r]obbery, unlike burglary, is not confined to a fixed *locus*, but is frequently spread over considerable distance and varying periods of time." (*Id*. at p. 251.) Later cases, however, have extended the rule to burglary. (See *People v. Fuller* (1978) 86 Cal.App.3d 618, 623; *People v. Bodely* (1995) 32 Cal.App.4th 311 (*Bodely*).) *Bodely* reasoned that although a burglary is complete for other purposes when the burglar leaves the structure, "application of the escape rule to burglary is consistent with the 'one continuous transaction' test." (*Bodely*, *supra*, at p. 314.) Similarly, the escape rule has been extended to felony murder in the perpetration of rape even though rape itself is complete upon penetration, because "flight following a felony has also been considered as part of the same transaction." (*People v. Portillo* (2003) 107 Cal.App.4th 834, 843.)

The escape rule also has been extended to other contexts requiring proof that an act occurred in the commission of a crime — such as inflicting great bodily injury in the course of commission of a crime (*People v. Carroll* (1970) 1 Cal.3d 581, 584-585), kidnapping for purposes of robbery (*People v. Laursen* (1972) 8 Cal.3d 192, 199-200), and use of a firearm in the commission of a robbery (*People v. Fierro* (1991) 1 Cal.4th 173, 225-226).

At trial, defense counsel requested that the jury be instructed on the escape rule, as set out in CALCRIM No. 3261. That instruction (as adapted to apply to a male perpetrator when the alleged crime is burglary) reads: "The crime of burglary continues until the perpetrator has actually reached a temporary place of safety. The perpetrator has reached a temporary place of safety if he has

6

successfully escaped from the scene, is no longer being chased[, and has unchallenged possession of the property]." (See CALCRIM No. 3261.) The trial court refused defendant's request for this instruction because the bench note to the instruction states, "This instruction should **not** be given in a felony-murder case to explain the required temporal connection between the felony and the killing. . . . This instruction should only be given if it is required to explain the duration of the felony for other ancillary purposes, such as use of a weapon." (Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 3261, p. 990 (Bench Notes).)

The CALCRIM drafters relied on the following language in *People v. Cavitt* (2004) 33 Cal.4th 187, 208 (*Cavitt*): "[W]e first recognize that we are presented with two related, but distinct, doctrines: the continuous-transaction doctrine and the escape rule. The 'escape rule' defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony (*People v. Cooper* (1991) 53 Cal.3d 1158, 1167), by deeming the felony to continue until the felon has reached a place of temporary safety. (E.g., *People v. Bodely*[*, supra,*] 32 Cal.App.4th 311, 313.) The continuous-transaction doctrine, on the other hand, defines the duration of *felony-murder* liability, which may extend beyond the termination of the felony itself, provided that the felony and the act resulting in death constitute one continuous transaction." Based on this language in *Cavitt*, the CALCRIM bench note provides that the instruction on the escape rule should not be given in a felony-murder case, and that a jury should be instructed about that rule only in other situations in which "another instruction given to the jury has required some act 'during the commission or attempted commission' of the felony." (Bench Notes to CALCRIM No. 3261, *supra*, at p. 989.)

7

The referenced language in *Cavitt*, however, should be understood in the context of the facts of that case. The opinion explains at the outset that the case involves the "complicity aspect" of the felony-murder rule: "[W]e are not concerned with that part of the felony-murder rule making a *killer* liable for first degree murder if the homicide is committed in the perpetration of a robbery or burglary. Rather, the question here involves 'a *nonkiller's* liability for the felony murder committed by another.' [Citation]." (*Cavitt*, *supra*, 33 Cal.4th at p. 196.) In other words, *Cavitt* addressed the scope of accomplice liability in connection with the felony-murder rule. In that case, the two codefendants argued that they should not be responsible for a killing under the felony-murder rule if the third accomplice in the burglary, who had remained at the scene of the crime, killed the victim after the two codefendants had reached a place of temporary safety. Among other things, one defendant argued that the trial court had erred in modifying the instruction on the escape rule to specify that the rule would not apply to terminate liability for felony murder if any one of the perpetrators continued to exercise control over the victim. The above quoted comments come from the portion of the opinion in *Cavitt* that addressed this claim. In that context, *Cavitt* concluded the instruction on the escape rule need not have been given at all. (*Cavitt*, *supra*, at p. 208.)

*Cavitt* does not support the conclusion that an instruction on the escape rule is inapplicable in a felony murder case like the present one, in which the complicity aspect of the felony-murder rule is *not* at issue and the question *is* whether "a *killer* [is] liable for first degree murder if the homicide is committed in the perpetration of a . . . burglary." (*Cavitt*, *supra*, 33 Cal.4th at p. 196.) *Cavitt* notes that the escape rule applies "in the context of certain ancillary consequences of the felony." (*Id.* at p. 208.) We have long recognized that one of those ancillary consequences is the perpetrator's liability under the felony-murder rule.

8

"[T]he traditional 'escape rule' has been applied to define the duration of robbery in the context of numerous statutes defining the ancillary consequences of robbery." (*People v. Fierro, supra,* 1 Cal.4th at p. 226, citing, among other examples, *People v. Salas* (1972) 7 Cal.3d 812, 823-824 [applying escape rule in the context of felony murder].) Indeed, "[t]he escape rule originated in the context of the felony-murder doctrine in the landmark case of *People v. Boss*[, *supra*,] 210 Cal. 245." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1166 (*Cooper*).)[1] The escape rule is "used in felony-murder cases to determine when a killing is so closely related to an underlying felony as to justify an enhanced punishment for the killing." (*People v. Bigelow* (1984) 37 Cal.3d 731, 753.)[2] "Under this test . . .

---

[1]  *Cooper,* which was cited in *Cavitt,* clearly recognized the applicability of the escape rule to felony murder. *Cooper* drew a distinction between the rule used to determine when a robbery is complete for purposes of accomplice liability, and *the rule used to determine when a robbery is complete for purposes of the felony-*murder rule. *Cooper* concluded that a getaway driver is an accomplice, rather than an accessory after the fact, if he or she forms the intent to aid in the robbery before the perpetrator has reached a place of temporary safety *with the stolen goods.* (*Cooper*, *supra*, 53 Cal.3d at pp. 1169-1170.) *Cooper* recognized that under the traditional "escape rule," as applied in felony-murder cases, the felony continues until the perpetrator reaches a place of temporary safety, regardless of whether he or she still has the stolen goods. (*Id.* at p. 1166.)

Similarly, *Bodely*, *supra*, 32 Cal.App.4th at page 313, which also was cited in *Cavitt*, clearly recognized the applicability of the escape rule to felony murder. *Bodely* held that the escape rule applies to felony-murder cases involving burglary because the "immediate escape from the scene of a crime is no less a part of the same continuous transaction which includes the crime when the crime is burglary than when the crime is robbery." (*Ibid*.)

[2]  The CALJIC instructions, which are still available, have provided, since at least 1979, that for purposes of the felony-murder rule, a robbery is complete "when the perpetrator has eluded his pursuers, if any; has reached a place of temporary safety and is in unchallenged possession of the stolen property after having effected an escape with such property." (CALJIC No. 9.15 (4th ed. 1979); see *id*., Use Note at p. 369 ["This instruction is designed for use in connection

*(footnote continued on next page)*

the crime continues until the criminal has reached a place of temporary safety."
(*Bigelow,* at p. 753.)[3]

Recognizing that the escape rule has long been applied to determine whether a killing has occurred in the commission of a felony, the Court of Appeal attempted to reconcile the above quoted language in *Cavitt* "with cases that have discussed temporary safety as a component of the felony-murder rule." The Court of Appeal reached the conclusion that "for purposes of the felony-murder rule, a robbery or burglary continues, *at a minimum*, until the perpetrator reaches a place of temporary safety. . . . But reaching a place of temporary safety does not, in and of itself, terminate felony-murder liability so long as the felony and the killing are part of one continuous transaction."

That statement may be accurate in some circumstances, as in *Cavitt*, in which one perpetrator had escaped to a place of safety while another remained at the scene of the felony and the killing. However, in cases like the present one, involving a single perpetrator, we have never suggested that if the perpetrator flees the scene of the crime and reaches a place of temporary safety before the killing,

---

*(footnote continued from previous page)*

with a charge of felony murder based on robbery or a charge of kidnapping for the purpose of robbery"].) The current CALJIC instructions continue to include the escape rule in the instructions designed for use in felony-murder cases based on robbery (CALJIC No. 8.21.1) and on other crimes, including burglary and rape. (CALJIC No. 8.21.2.)

[3] *People v. Bigelow* applied the escape rule to determine the scope of the special circumstance of murder committed to " 'perfect . . . an escape from lawful custody,' " and concluded that an escapee who had remained at liberty for 12 days and traveled over a thousand miles had reached a place of temporary safety. (*People v. Bigelow, supra,* 37 Cal.3d at p. 751; see *id*. at p. 754.)

the killing and the felony could still be considered part of one continuous transaction.  Respondent cites no case that so suggests.

Rather, when the killing occurs during the flight from a felony, this court and the intermediate appellate courts have, both before and after the decision in *Cavitt*, consistently applied the escape rule to test the sufficiency of the evidence that a killing occurred in the commission of the felony.  (See, e.g., *People v. Young*, *supra*, 34 Cal.4th at pp. 1175-1177 [jury could reasonably conclude that robbery was not complete when the killing occurred 120 to 150 feet from the scene of the robbery]; *People v. Ford* (1966) 65 Cal.2d 41, 56-57 [evidence did not establish felony murder because, during the four hours between the robbery and the killing, the perpetrator had driven "aimlessly over a great distance" and had reached "places of temporary safety"]; *People v. Russell* (2010) 187 Cal.App.4th 981, 992 [evidence sufficient to support finding that defendant had not reached a place of temporary safety when he fled from officers at high speed less than 12 minutes after burglary]; *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 80 [evidence sufficient to support a finding that defendants failed to reach a place of temporary safety before they caused the accident that took the victim's life]; *People v. Johnson* (1992) 5 Cal.App.4th 552, 560-561 [evidence sufficient to support finding that defendant did not reach a place of temporary safety, but was in constant flight for the 30 minutes between the robberies and the fatal accident]; see also *People v. Milan* (1973) 9 Cal.3d 185, 195 [instruction on felony murder was proper when the jury could conclude "that defendant had not won a place of temporary safety when he shot" the victim].)

"Felony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety because the robbery and the accidental death, in such a case, are parts of a 'continuous transaction.' " (*People v. Thongvilay, supra*, 62 Cal.App.4th at p. 77.)

11

Some acts may occur as part of the same transaction as the felony but before the perpetrator attempts to flee. (See, e.g., *People v. Fields* (1983) 35 Cal.3d 329, 364-367 [defendant killed victim after maintaining control over her for several hours after robbing her]; *People v. Carroll*, *supra*, 1 Cal.3d at p. 584 [after robbing the victim of his wallet, finding no money, and disposing of the wallet, defendant shot the victim out of anger and for revenge].) When the killing occurs during flight, however, the escape rule establishes the "outer limits of the 'continuous-transaction' theory." (*People v. Portillo, supra*, 107 Cal.App.4th at p. 846.) "Flight following a felony is considered part of the same transaction *as long as the felon has not reached a 'place of temporary safety.'* " (*People v. Fuller, supra,* 86 Cal.App.3d at p. 623, italics added, quoting *People v. Salas*, *supra*, 7 Cal.3d at p. 822.) This court did not intend to change this well-settled principle or to expand the scope of the felony-murder rule when it decided a related, but different, issue in *Cavitt*.

Respondent argues that the escape rule "defines the duration of the underlying felony" and that we have consistently held that the duration of felony-murder liability is not determined by considering whether the felony itself has been completed. (See *People v. Ainsworth* (1988) 45 Cal.3d 984, 1016; *People v Chavez* (1951) 37 Cal.2d 656, 670.) Respondent's argument fails because the escape rule does not define the duration of the underlying felony for purposes other than determining whether a killing or some other act has occurred in the perpetration or commission of the felony. In this context, courts often describe the escape rule as defining the duration of the felony. (See, e.g., *People v. Fierro, supra*, 1 Cal.4th at p. 226 ["the traditional 'escape rule' has been applied to define the duration of robbery in the context of numerous statutes defining the ancillary consequences of robbery."].) In other contexts, however, the escape rule is not applicable and the scope of the felony is defined more narrowly. (See, e.g.,

12

*People v. Montoya* (1994) 7 Cal.4th 1027, 1045, fn. 9 ["the liability of an aider and abettor to burglary may not be based upon an intent to commit, encourage, or facilitate the commission of the offense, when such intent arises after the perpetrator has departed from the structure"]; *Cooper*, *supra*, 53 Cal.3d at p. 1165 [robbery continues during escape, for purposes of determining whether a person has acted as an accomplice or as an accessory, only while the perpetrator still has possession of the loot]; *People v. Failla* (1966) 64 Cal.2d 560, 569 [burglary is complete for purpose of determining whether crime is an attempt or a completed crime when any part of the body of the intruder is inside the premises].) Thus, the escape rule does not, as respondent contends, artificially cut off liability based on considerations not relevant to the felony-murder rule. Rather, " 'the escape rule serves the legitimate public policy considerations of deterrence and culpability' by extending felony-murder liability beyond the technical completion of the crime." (*Bodely, supra*, 32 Cal.App.4th at pp. 313-314, quoting *Cooper, supra*, 53 Cal.3d at p. 1167.)

Respondent argues that application of the escape rule to felony murder would result in treating cases differently depending on whether the killing occurred before or after the defendant reached a place of safety even though the defendant's conduct may have been equally culpable. The felony-murder rule, however, does not take into account the relative culpability of the defendant's actions or state of mind. Its application depends only on whether the murder was "committed *in the perpetration of*" the felony. (Pen. Code, § 189, italics added.) As we have noted, the "Legislature has said in effect that [the] deterrent purpose [of the felony-murder rule] outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing . . . . Once a person perpetrates or attempts to perpetrate one of the enumerated felonies, then in the judgment of the Legislature, he is no longer entitled to such fine judicial

13

calibration, but will be deemed guilty of first degree murder for any homicide committed in the course thereof." (*People v. Burton* (1971) 6 Cal.3d 375, 388; see *People v. Farley* (2009) 46 Cal.4th 1053, 1121.)

Respondent finally argues that there need be only a "causal nexus" between the burglary and the homicide. In the present case, respondent argues, there is a sufficient nexus between the burglary and the homicide because the homicide was caused by defendant's act of driving away from the scene of the crime with his truck loaded with stolen items that were not secured. Our opinion in *Cavitt* made clear, however, that "the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death." (*Cavitt, supra*, 33 Cal.4th at p. 193.) The causal relationship is established by a "logical nexus" between the felony and the homicidal act, and "[t]he temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction." (*Ibid*.) Although, as discussed above, *Cavitt* addressed an accomplice's liability under the felony-murder rule, respondent provides no rationale or authority for eliminating the required "temporal relationship" in cases involving the liability of a sole perpetrator.

**2. The Trial Court Erred in Refusing to Instruct on the Escape Rule**

If the court has properly instructed on the required relationship between the felony and the murder, which relationship is an element of the crime, the trial court has no sua sponte duty to clarify or amplify the scope of that element if the evidence does not raise an issue as to whether that relationship exists. (*Cavitt, supra*, 33 Cal.4th at pp. 203-204 [because the evidence did not raise an issue as to the existence of a logical nexus between the felony and the homicide, the trial court had no duty to clarify this requirement sua sponte]; *People v. Garrison* (1989) 47 Cal.3d 746, 792 [trial court not required to instruct sua sponte on the

14

principle that a murder does not occur in the commission of a felony if the felony is merely incidental to the murder, when the evidence raised no issue as to whether the felony was incidental to the murder]; *People v. Guzman* (1988) 45 Cal.3d 915, 952 [trial court had no sua sponte duty to clarify the meaning of the phrase "while [defendant] was engaged in . . . the commission of" the felony, where defense did not rely on theory that the murder did not occur while the killer was engaged in the felony and the facts plainly established that it did].)

When a legally correct instruction is requested, however, it should be given "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) In the present case, defendant requested an instruction on the escape rule (CALCRIM No. 3261), and there was substantial evidence supporting the instruction. There was no direct evidence of the precise time at which the burglary occurred. The property was last seen at the Kane house on Thursday, July 6, and was recovered days later. Defendant testified that after loading the truck with the appliances, he drove to Palm Springs, speaking to Trivich on the way and telling her that he had some large appliances. He testified that he arrived at a friend's house in Palm Springs, but was unable to unload the truck by himself. After using the bathroom and lying down for a while he decided to return to Long Beach and got back on the freeway, stopping at a gas station to make a telephone call.

Even under the prosecution's theory of events, defendant was 62 miles away from the scene of the burglary when the stove fell off his truck and he had been driving on the freeway at normal speeds for about an hour. There was no evidence that anyone was following him or that anyone was even aware of the burglary. A jury could have concluded that the fatal act occurred when the stove fell off the truck and that defendant had reached a place of temporary safety before the fatal act occurred. Indeed, the trial court implicitly concluded that an

15

instruction clarifying the relationship between the felony and the killing was necessary, because it chose to instruct the jury with CALCRIM No. 549, the instruction designed to be used "[i]f the evidence raises an issue of whether the felony and the homicide were part of one continuous transaction." (Bench Notes to CALCRIM No. 549 (2012) p. 335.)[4]

### 3. Standard of Prejudice

The parties disagree on what standard of prejudice applies to this instructional error. When the jury is "misinstructed on an element of the offense . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt." (*People v. Hayes* (1990) 52 Cal.3d 577, 628 [misinstruction on "immediate presence" element of robbery required reversal under *Chapman* standard]; see also *People v. Harris* (1994) 9 Cal.4th 407 [misinstruction on "immediate presence" element of robbery was harmless beyond a reasonable doubt].) Defendant contends that the trial court's failure to instruct on the escape rule amounted to misinstruction on an element of the offense and violated his federal constitutional rights to due process and a trial by jury.

---

[4] We note that had the court simply given CALCRIM No. 3261 in addition to CALCRIM No. 549, the result may have been confusing or misleading because the two instructions were not drafted in contemplation that they would be given together. CALCRIM No. 3261 defines the escape rule in terms of the duration of the burglary ("[t]he crime of burglary continues until the perpetrator has actually reached a temporary place of safety"), while CALCRIM No. 549 defines the scope of felony murder by reference to whether the burglary and the act causing death were part of one continuous transaction. Without attempting to prescribe the exact instructions that should have been given here or should be given in similar cases, we reiterate the court had a duty to provide instructions that correctly state the law. It could have done so by informing the jury that a killing committed after a fleeing felon has reached a place of temporary safety does not occur in the commission of the felony.

Consequently, defendant argues, the federal harmless error standard applies and his conviction must be reversed unless this court concludes that the instructional error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24.)

Respondent argues that even if the trial court erred, its error was one of state law only — a refusal to give a pinpoint instruction. Pinpoint instructions "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case, such as mistaken identification or alibi. (See *People v. Rincon–Pineda*[ (1975)] 14 Cal.3d [864,] 885.) They are required to be given upon request when there is evidence supportive of the theory . . . ." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) For such a state law error, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The error in this case amounted to more than a failure to give a pinpoint instruction because the instruction that the court gave on the "continuous transaction" element of felony murder was — in absence of an instruction on the escape rule — incomplete and misleading. The trial court instructed as follows: "In order for the People to prove that defendant is guilty of murder under a theory of felony murder, the People must prove that the burglary and the act causing the death were part of one continuous transaction. The continuous transaction may occur over a period of time in more than one location. In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] 1. Whether the felony and the fatal act occurred at the same place. [¶] 2. The time period, if any, between the felony and the fatal act. [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony. [¶] 4. Whether the fatal

17

act occurred after the felony but while the perpetrator continued to exercise control over the person who was the target of the felony.  [¶]  5. Whether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime.  [¶] 6. Whether the felony was the direct cause of death.  [¶]  And [¶]  7. Whether the death was a natural and probable consequence of the felony.  [¶]  It is not required that the People prove any of these factors or any particular combination of these factors.  The factors are give[n to] assist you in deciding whether the fatal act and the felony were part of one continuous transaction."  (See CALCRIM No. 549.)

As noted, the jury was told that it could consider "[w]hether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime."  Nothing in the instruction, however, informed the jury that there was any rule it must apply in determining whether the felony and the fatal act were part of one continuous transaction or in determining whether defendant's flight had ended.  Furthermore, the jury was told that the listed factors were simply ones that the jury "may consider," and that the People need not "prove any of these factors or any particular combination of factors."  Under these instructions, even a juror who believed that defendant had reached a place of temporary safety before the fatal act occurred would have no reason to conclude that he or she must find the defendant not guilty of first degree murder.  The instructions given, therefore, amounted to misinstruction on an element of the offense of first degree murder.[5] Accordingly, the federal harmless error standard applies.

---

[5]    We express no opinion on whether CALCRIM No. 549 would be correct or complete when given in a case that did not raise an issue of the applicability of the escape rule.

### 4. Assessment of Prejudice

"In deciding whether a trial court's misinstruction on an element of an offense is prejudicial to the defendant, we ask whether it appears ' " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " ' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1013, quoting *People v. Hagen* (1998) 19 Cal.4th 652, 671.)  In *People v. Hayes*, *supra*, 52 Cal.3d 577, this court reversed a robbery conviction because the jury had been misinstructed on the meaning of " 'immediate presence' " for the purposes of robbery's requirement that the property be taken from the victim's immediate presence.  We noted that the evidence did not establish immediate presence as a matter of law.  "The room in which [the victim] was assaulted and killed was stipulated to be 107 feet from the stolen property's location, namely, the motel office and living quarters, and both were on the same motel premises.  Under these circumstances, a reasonable finder of fact could conclude either that the property was not so distant as to be beyond the victim's control and protection, or that it was too distant to be in the victim's immediate presence at the time the force was used.  Because the issue of immediate presence could reasonably have been decided either way, we are unable to declare that the misinstruction on this element of robbery was harmless beyond a reasonable doubt." (*Id.* at pp. 628-629.)

This case is analogous to *Hayes* in that a reasonable trier of fact could have concluded either that defendant had reached a place of temporary safety before the fatal act occurred, or that he had not.  Even under the prosecution's view of the facts, a properly instructed jury could have concluded that the fatal act was defendant's act of driving in a manner that caused the stove to fall off of his truck, and it could have concluded that defendant had reached a place of temporary safety at the time of the fatal act because he had been driving for about an hour at normal speeds and was not being followed.  Furthermore, although the jury clearly

19

disbelieved defendant's testimony that he had not stolen the property from the Kane home, it could have believed other portions of his testimony that he had stopped to make a phone call, or that he had stopped at Sean Doherty's house before the accident. Finally, given the lack of evidence regarding exactly when the burglary took place, the jury could have reasonably concluded that the prosecution failed to prove beyond a reasonable doubt that defendant had not reached a place of temporary safety before the fatal act.

Even were we to conclude that the instructional error in this case did not amount to federal constitutional error subject to review under *Chapman*, reversal would be required under the standard applicable to state law instructional errors. "Under the *Watson* standard, prejudicial error is shown where ' " 'after an examination of the entire cause, including the evidence,' [the reviewing court] is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [Citation.] "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." [Citation.]' " (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

There is more than an abstract possibility that the instructional error affected the verdict in this case. Nothing in counsel's arguments at trial helped to clarify the law for the jury. The prosecutor argued, among other things, that the burglary and the killing were part of a single transaction because defendant was still driving away with the stolen property. He addressed the factors listed in the instruction, arguing that almost all of them applied, but emphasized that the jurors could use other factors and their own common sense. Defense counsel argued that the burglary was over before the time of the killing because defendant left the scene of the crime and no one was following him or was aware of the crime — but there was no solid legal basis for his argument in the instructions. As noted above,

20

even if the jury rejected all of defendant's testimony, the prosecution did not dispute that at the time of the accident the burglary had not yet been discovered, and defendant was at least 60 miles and one hour from the crime scene, had made a telephone call a half-hour earlier, and had been driving at a normal speed. Given the evidence, there is a reasonable probability that a jury properly instructed on the escape rule would have concluded that defendant had reached a place of temporary safety before the fatal act occurred and was not guilty of felony murder.[6]

## DISPOSITION

The judgment of the Court of Appeal upholding defendant's conviction for first degree murder is reversed, and the matter is remanded for further proceedings consistent with this opinion.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

---

[6] Defendant does not argue that the evidence was insufficient to support a conviction for felony murder. Consequently, there is no bar to his being retried for felony murder. (See *People v. Hernandez* (2003) 30 Cal.4th 1, 6.)

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Wilkins

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 191 Cal.App.4th 780
**Rehearing Granted**

_____

**Opinion No.** S190713
**Date Filed:** March 7, 2013

_____

**Court:** Superior
**County:** Orange
**Judge:** Richard F. Toohey

_____

**Counsel:**

Richard A. Levy, under appointment by the Supreme Court, and Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons and Julie L. Garland, Assistant Attorneys General, Teresa Torreblanca, Steven T. Oetting and Susan Miller, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard A. Levy
3868 W. Carson St., Suite 205
Torrance, CA  90503-6706
(310) 944-3311

Steven T. Oetting
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2206