Filed 6/10/16  P. v. Carter CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B259905 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA112779) |
| v. | |
| JULIAN CARTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge.  Reversed in part, affirmed in part.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Eric E. Reynolds, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Julian Carter appeals from the judgment entered following a jury trial that resulted in his conviction for second degree murder. Carter contends the trial court committed prejudicial instructional error during the sanity portion of the trial.[1] We agree, and therefore reverse the jury's sanity finding.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Carter's conviction for murdering Mireya*

Carter lived with his mother, Debra Carter, his sister, Tina Carter, and his five-year-old niece, Mireya.[2] Kristal and Luther "L.C." Carter are his siblings, and Kyle Blaylock is his cousin. Between approximately 2:00 a.m. and 6:00 a.m. on June 13, 2010, Carter killed Mireya by cutting her throat with a serrated knife.

Carter was charged with murder, but was found incompetent to stand trial. Proceedings were suspended and he was treated at Patton State Hospital.

In February 2013, Carter's competency was deemed restored. He pleaded not guilty by reason of insanity. A jury found him guilty of murder (Pen. Code, § 187, subd. (a))[3] with the use of a deadly weapon. (§ 12022, subd. (b)(1).) It deadlocked on the degree of the offense, and the trial court designated the crime as second degree murder.[4] The jury also deadlocked on the question of Carter's sanity, with eight jurors voting for a finding of insanity. The trial court declared a mistrial as to the sanity portion of the trial.

2. *Second sanity trial*

A second sanity trial commenced in June 2014, at which the following evidence was adduced.

---

[1]     Carter also argues that he is entitled to one additional day of presentence custody credit. Given our conclusion that reversal is required, this contention is moot.

[2]     For ease of reference, and with no disrespect, we refer to defendant as "Carter" and to his family members by their first names.

[3]     All further undesignated statutory references are to the Penal Code.

[4]     The validity of the jury's verdict at the guilt phase is not challenged on appeal.

a. *Carter's mental health and behavior prior to the murder*

Carter was at some point committed to the California Youth Authority for committing an armed robbery. He was released and returned to the Youth Authority on probation violations one or more times. While committed to the Youth Authority, Carter displayed indications of psychotic behavior, including exhibiting paranoia, making nonsensical statements, and responding to internal stimuli.

Carter had three psychiatric hospitalizations during the year preceding the murder. According to Debra and Kristal, Carter's behavior changed after he returned home from the Youth Authority. Among other things, he had an aversion to being touched. Concerned, Debra and Kristal attempted to obtain mental health assistance for him. In August 2009, they drove Carter to Harbor-UCLA Medical Center, but he refused to exit the car and the hospital was unable to admit him without his consent. On the drive home he attempted to jump from the car and bit both women when they tried to restrain him. Police officers transported him back to the hospital, where he was admitted. After approximately three weeks, he was released with a 10-day supply of medication.

During the months preceding the murder, Carter acted in a bizarre fashion. One morning Debra saw him dancing in the middle of the street at 2:00 a.m. On another occasion she saw him dancing in the street in the rain. A "couple weeks" before the murder, he climbed out his bedroom window and walked back into the house through the front door, repeating this cycle approximately 18 times. Debra chained the window shut. He also talked to himself occasionally. On other occasions, he would laugh inappropriately and for no reason. At some point after his return from the Youth Authority, he began taking baths in oatmeal, remaining in the tub for hours at a time. He stated on at least one occasion that he was "trying to wash away the demons." Once, when Kristal coaxed him out of the bath, he walked around naked, covered in wet oats. He took such an oatmeal bath within the week before the killing.

The day before the murder, June 12, 2010, Carter was acting "fairly normal." That evening, he left with Luther. When he returned home at approximately 10:00 p.m. or 11:00 p.m., he was incoherent and "tripping." At some point during the day or evening,

3

he did not recognize Blaylock.  Blaylock conceded that it was possible Carter was under the influence of alcohol or drugs.  According to Debra, Carter was loud and cursed at her, behavior that was out of character for him.  Carter stated that his brother Luther was actually his son.[5]  When Debra called Luther so Carter could speak to him, Carter insisted the person on the phone was not Luther.  Carter exited the house through the back door and reentered through the front door several times.  Carter then entered the bathroom, where he remained for several hours, taking an oatmeal bath.  Later, he stood at the doorway of the living room and stared at Tina and Mireya.  According to Debra, Carter's eyes did not look "normal."

### b. *The murder and investigation*

Debra, Tina, and Mireya fell asleep in the living room.  At approximately 2:00 a.m., Carter came into the room and appeared to take a photograph of Tina and Mireya with a cellular telephone.[6]  Debra asked what he was doing, but Carter left the room.

When Debra and Tina awoke the next morning at approximately 6:30 a.m., they discovered Mireya was missing.  Carter was not in his bedroom either.  Blaylock had seen Carter as he left the house that morning; Carter had not looked like himself and appeared angry and frustrated.  Blaylock went outside to look for Mireya and caught up with Carter approximately a block from the house.  When Blaylock told Carter that Mireya was missing, Carter did not respond.  Blaylock suggested that he and appellant " 'go back' " to the house.  Carter began to walk toward the house but then turned and walked in the opposite direction.  Meanwhile, Debra and a neighbor drove around the neighborhood in the neighbor's pickup truck looking for Mireya.  They located Carter a few blocks away.  He was headed in the direction of a Metro station.  Debra asked where Mireya was, and Carter replied that she was " '[a]t home.' "  Carter followed Debra's

---

[5]     Carter does not have children.

[6]     No such photograph was discovered during a subsequent search of Carter's and other family members' cellular telephones.

4

request that he get in the bed of the truck. Several police vehicles were around the house, and the area was roped off. When the truck stopped near the house, Carter exited and walked away. Someone brought him back to the house.

A deputy sheriff found Mireya's body in Carter's closet, stuffed in a trash bag. Carter had killed her by sawing her neck with a serrated kitchen knife. There were several wounds to her neck, one fatal. After placing Mireya's body in the bag in the closet, Carter wrapped the knife in several shirts and a child's jacket and hid the bundle inside a drawer underneath his bed. Carter then changed his shirt and walked out of the house. Unused condoms were strewn about the room, but there was no evidence of any sexual contact between Carter and Mireya.

Detectives Kevin Lowe and Ralph Hernandez interviewed Carter at the sheriff's station. Carter admitted killing Mireya. When asked why, he stated "Psychological, that's, uh, I mean, that's basically it." He was talking with Mireya after he "tried . . . some little B.S." He did "not really" intend the killing; it "just happened." There was "a lot of stuff . . . going off periodically." He informed Hernandez that the knife was in the bedroom. While being handcuffed during the booking process, Carter broke free and ran towards a stairwell, but his progress was blocked by the detectives. Hernandez did not observe evidence that Carter was intoxicated or on drugs, and no drug test was done.

According to Debra, when Carter was "normal," he treated Mireya like she was his own daughter; he "loved that little girl." Kristal testified that Carter and Mireya "loved each other." Carter never hit or argued with Mireya, and never behaved toward her in an inappropriate or unusual way. Blaylock testified that when Carter was "normal" he did "everything for" Mireya and never mistreated her.

According to Debra, no medication was available for Carter to take during the period preceding the murder.

c. *Expert and medical testimony*

(i) *Patton State Hospital*

As noted, after his arrest Carter was treated at Patton State Hospital. Dr. Ron Foo, Carter's treating physician, testified that he diagnosed Carter with schizophrenia.

5

Schizophrenia is a disorder that must be treated with medication if there is any hope for success. Carter did not initially respond well to the medication given. Foo changed his medications to a new drug, which resulted in "fairly noticeable improvement."

Patton records indicated when Carter arrived at the hospital he was considered to be psychotic as a result of bizarre and disorganized behaviors, including grandiose delusions and response to internal stimuli. Although HIV positive, he refused to take medication for his HIV.

(ii) *Expert testimony*

Four experts opined regarding Carter's sanity. Dr. Raphael Morris, a psychiatrist, and Dr. Jack Rothberg, a forensic psychiatrist, testified for the defense. Forensic psychologist Haig Kojian testified for the People, as did forensic psychiatrist Dr. Gordon Plotkin, who had been appointed by the court. The People's experts opined that Carter was not legally insane; the defense experts testified to the contrary.

All four experts agreed that Carter suffered from a major mental disorder. Kojian and Morris opined that Carter suffered from Schizoaffective Disorder, Bipolar type. Plotkin opined Carter suffered from a major mental disorder, "probably on the lines of schizophrenia." Rothberg concluded Carter was "severely mentally ill."

All four also agreed that Carter knew and understood the quality of his actions when he killed Mireya: he knew Mireya was his niece and he knew he used a kitchen knife to cut her throat. Carter never claimed he thought Mireya was, for example, a demon or an inanimate object. The experts disagreed, however, about whether Carter knew the wrongfulness of his actions.

*Dr. Kojian*

Based in part on Carter's statements, Kojian concluded Carter knew his actions were legally or morally wrong. Carter had attempted to hide Mireya's body and the murder weapon, left the house, and attempted to flee from apprehension, all of which suggested consciousness of guilt. Carter would have had no reason to flee or hide evidence if he believed he had done nothing wrong. Carter's statement to detectives that

6

he killed Mireya for "psychological" reasons potentially showed he was making an excuse, which also demonstrated knowledge of the wrongfulness of his conduct.

### Dr. Plotkin

Dr. Plotkin likewise opined that Carter knew the murder was wrongful because his actions demonstrated consciousness of guilt. Plotkin based his opinion on Carter's statements to him that he argued with his sister and mother the day before the murder regarding whether there was something wrong with his brother; he was angry at his sister and mother; woke up angry; and decided to commit the killing. Neither Carter's statements nor any other evidence suggested an alternative explanation for his actions, such as that he believed Mireya was a demon. There was "no delusion involved." No other psychotic mood or psychiatric symptoms existed that would have interfered with his ability to know his behavior was wrong. Plotkin questioned whether Carter actually suffered from auditory hallucinations; opined that Carter's symptoms and actions on the night of the murder may have been related to his use of marijuana and methamphetamine rather than mental illness; and opined that some of Carter's actions while incarcerated or at Patton, such as drinking toilet water and smearing feces on the walls, were manipulative.

### Dr. Morris

Dr. Morris opined that Carter did not know the wrongfulness of his actions at the time of the murder and was therefore insane within the meaning of *M'Naghten*.[7] Many of Carter's actions made no sense and could only be explained by his schizoaffective disorder. Carter had displayed paranoid and grandiose delusions, mutism, catatonia, response to internal stimuli, agitation, and hallucinations. Morris doubted that Carter's schizophrenia was drug induced, although he could not rule it out completely. He did not see evidence of malingering.

Carter was an "extremely poor historian" and had difficulty thinking; he also had a very limited ability to articulate the details of the crime, a circumstance possibly related

---

[7] *M'Naghten's Case* (1843) 8 Eng.Rep. 718.

to the fact his schizophrenia had been untreated for years. Morris disagreed with the conclusion Carter's behavior after the murder indicated he knew his actions were wrongful. Carter's actions were consistent with his primitive, concrete way of thinking and were too limited to demonstrate knowledge of wrongfulness. He had placed the knife and Mireya's body where they were sure to be found; did not travel far from his home; and told his mother Mireya was at home.

Carter's behavior in jail, his actions with his family, and his disorganized behavior demonstrated "he's not someone who's able to make rational decisions and understand what he's doing exactly." The "driving force here is the untreated mental illness and the deteriorating course, delusions, disorganization, irritability, insomnia. All these symptoms. His misinterpretation of the behaviors of his family, his hostility towards them, and all these things were in play at the time of this tragedy." Morris explained he was confident in his conclusions: "I've seen him in the serial interviews. So he's been still psychotic, still has symptoms at times when off medication. I've seen him [floridly] psychotic and out of control. . . . From putting it all together and taking all the evidence into consideration, it seems that he was in that state, untreated psychotic state before the death. [¶] So I've seen what he looks like when he's untreated and that's why I have this opinion."

*Dr. Rothberg*

Dr. Rothberg concluded Carter was insane. He did not believe Carter understood the wrongfulness of his actions. Rothberg explained, "It's well established that he is severely mentally ill. He demonstrated this for quite some time prior to the incident with multiple psychiatric hospitalizations in advance of the incident with clear psychotic symptoms." There was evidence Carter was highly delusional, paranoid, responding to voices, mute, and agitated. When Carter took medication, he became "a little bit better"; when he refused it, he got "worse, ultimately leading to his going to Patton now three years ago." Rothberg did not believe Carter's actions after the crime indicated an understanding that what he did was wrong. Because Carter was known to be "very psychotic," it was not possible to know why he left the house and fled. Rothberg

8

explained: "I don't know how anyone can come to a conclusion that this person was not seriously deranged when this occurred. And so what his motivation for running was is impossible for us to know. For all we know he could have thought the demons were going to kill him, and he needed to get away or maybe he thought the police were demons and they were going to execute him. . . . . we just don't know." Further, there was no rational motive for the crime.

3. *Verdict, sentence and appeal*

The jury found Carter was sane when he committed the murder. After Carter waived his right to a jury trial on the prior conviction allegation, the trial court found he had suffered a prior "strike" conviction for robbery. (§ 667, subds. (b) – (i).) It denied his *Romero* motion[8] and his motion for a new trial. The court sentenced Carter to 15 years to life on the murder charge, doubled pursuant to the "Three Strikes" law, plus a one-year deadly weapon enhancement, for a total term of 31 years to life. It imposed a restitution fine, a suspended parole revocation fine, a court operations assessment, and a criminal conviction assessment. Carter appeals.

## DISCUSSION

*The trial court's answer to the jury's question was prejudicial error*

1. *Additional facts*

During the second day of deliberations, the jury sent the trial court the following questions: "We would like to know if we can consider the lack of medical treatment prior to the crime in our decision? If we are unable to come to a[] unanimous decision how should we proceed?" The trial court sent back a written response stating: "No, you may not consider lack of medical treatment prior to the crime. [¶] Continue to deliberate. If you cannot reach a decision, notify the bailiff."

The court's minute order states that "[o]ff the record," the court and counsel conferred regarding the jury's question. The record does not suggest what prompted the

---

[8]     *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

9

jury's question, nor does it reveal the basis for the court's written response or the parties' positions on the issue.

2. *Discussion*

a. *Applicable legal principles*

"Under California's statutory scheme, '[p]ersons who are mentally incapacitated' are deemed unable to commit a crime as a matter of law." (*People v. Elmore* (2014) 59 Cal.4th 121, 140; § 26.) "Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity provided in section 25, subdivision (b). [Citations.] Under *M'Naghten*, insanity is established if the defendant was unable either to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed." (*People v. Elmore, supra,* at p. 140.) A defendant may suffer from a diagnosable mental illness without being legally insane under the *M'Naghten* standard. (*People v. Mills* (2012) 55 Cal.4th 663, 672.) A plea of not guilty by reason of insanity " 'is a statutory defense that does not implicate guilt or innocence but, instead, determines "whether the accused shall be *punished* for the *guilt* which has already been established." ' " (*People v. Blakely* (2014) 230 Cal.App.4th 771, 775.) The defendant has the burden of proving, by a preponderance of the evidence, that he was legally insane at the time he committed the crime. (§ 25, subd. (b); *People v. Elmore, supra,* at pp. 140-141; *People v. Mills, supra,* at p. 672.)

A trial court must instruct, sua sponte, on the general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Abilez* (2007) 41 Cal.4th 472, 517.) When a jury asks a question after retiring for deliberation, section 1138[9] imposes upon the court a duty to provide information the jury desires on

---

[9]    Section 1138 provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

10

points of law. (*People v. Roldan* (2005) 35 Cal.4th 646, 729, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; *People v. Hodges* (2013) 213 Cal.App.4th 531, 539; *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.) We apply the abuse of discretion standard to any decision by a trial court to instruct in its exercise of its supervision over a deliberating jury. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.) We independently determine whether the instructions given were correct and adequate. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767; *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1311.)

b. *Forfeiture*

The People argue that Carter has forfeited his claim, because the record does not reflect that his counsel objected to the trial court's answer to the jury's question. Citing *People v. Roldan,* the People argue that "[w]hen a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138." (*People v. Roldan, supra,* 35 Cal.4th at p. 729.) " 'The failure of defendant's counsel to object or move for a mistrial upon the court frankly informing him of the court's action might also be construed to be a tacit approval.' " (*Ibid.*) But *Roldan* distinguished *People v. Gurule* (2002) 28 Cal.4th 557, on the ground that there, "the trial court declined a jury request for a readback of defense counsel's closing argument '[a]fter conferring with the parties.' [Citation.] Contrary to defendant's claim . . . there is no indication the defense attorney in *Gurule* failed to object." (*People v. Roldan, supra,* at p. 729.) Likewise, because the discussion in the instant case regarding the jury's question transpired off the record, the record does not disclose whether defense counsel interposed an objection.

Even if we could infer the absence of an objection from defense counsel's failure to place an objection on the record or move for a mistrial, we have discretion to consider any instruction, even in the absence of an objection, "if the substantial rights of the defendant were affected thereby." (§ 1259; see, e.g., *People v. Johnson* (2016) 62 Cal.4th 600, 638-639; *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) Accordingly, we consider the merits of Carter's claim.

11

c. *The response to the jury's question was error*

Carter argues the trial court's instruction was prejudicial error because "the lack of medical treatment on a severe mental illness whose symptoms include psychosis logically tends to increase the probability of a psychotic episode – and thus increase the likelihood of legal insanity"; further, it is "axiomatic that a schizophrenic is more likely to experience psychosis if his illness is in an untreated state as opposed to a treated one."

We agree. The phrase "lack of medical treatment," at a minimum, encompasses the circumstance that a patient is not taking medication to treat a mental illness. The jury's question referenced lack of treatment "prior to" the murder, but did not specify a time frame. As phrased, "prior to" the crime encompasses the period immediately preceding the murder. Thus, the trial court's response effectively precluded jurors from considering, among other things, whether Carter was or was not medicated when he committed the killing, and any effect that the absence of treatment may have had on his mental state.

The People argue that the trial court's response was correct. Because the experts agreed Carter suffered from a mental illness at the time of the murder, but knew and understood the nature and quality of his actions, the only real issue was whether Carter "was incapable of knowing or understanding that his act was morally or legally wrong." (See CALCRIM No. 3450.) The focus of the wrongfulness prong is the defendant's mental state at time of the crime, an issue the People suggest should be determined only by reference to Carter's actions, statements, and behavior at the time of the murder. Thus, in the People's view, Carter's prior lack of treatment had no bearing on whether he knew the wrongfulness of his actions.

We are not persuaded. The People cite no authority for the proposition that a defendant's lack of treatment before the crime is irrelevant to the *M'Naghten* test. On the evidence here, whether Carter was, or was not, being treated and medicated in the period prior to the murder was highly relevant to resolution of the "knowledge of wrongfulness" prong. There was evidence Carter was not being treated or medicated during the period just preceding the murder. His mother testified there was no medication available for

12

him, and he told Dr. Kojian he had not been taking his medication at the time of the murder. There was evidence that when untreated and unmedicated, Carter's condition deteriorated and he became psychotic.[10] Whether he was, or was not, psychotic, and the degree of his psychosis, at the time he committed the killing was obviously relevant to determination of whether he knew the wrongfulness of his actions. Considering the reverse of the situation here illustrates the point: had Carter been treated and taking effective medication in the period before the murder, we have little doubt that the People would have sought to rely on such evidence to establish his sanity.

As recited above, Dr. Morris based his opinion in part on the premise that the lack of treatment or medication made it more likely Carter was psychotic and symptomatic, and unable to appreciate the wrongfulness of his actions when he committed the crime. Further, the prosecution's experts based their conclusions in large part on their view that Carter's actions after the murder – hiding the body and the knife, leaving the house – demonstrated consciousness of guilt. Morris and Rothberg countered that given Carter's deranged state, it was impossible to determine the reason for his actions. Morris, for example, rejected the notion that Carter's act of changing his bloody clothing was an effort to cover up the crime, explaining: "I can't make that determination in his case. I mean, he's doing one disorganized thing after another. He's drinking toilet water. He's bathing in oatmeal." In other words, if Carter's mental state had deteriorated due to the lack of treatment and/or medication, his post-crime behavior was not susceptible to the

---

[10] For example, when Morris first saw Carter, Carter was medicated. When Morris next saw Carter, Carter was in jail; he had been off medication for some time and his mental state had deteriorated. For safety reasons, Morris was allowed to speak with Carter only when accompanied by 10 sheriff's deputies. Carter "looked like a totally different person." He hid under the bed, got up and paraded around naked, and was agitated and pacing. When Morris saw Carter a third time, Carter was at Patton State and was medicated. He looked totally different again, was no longer mute, and was able to sit calmly in a room and speak with Morris. Conversely, Dr. Plotkin testified that Carter stated he had been taking his medications at the time of the murder, and so Plotkin "would presume that his illness would be stable."

13

characterization suggested by the prosecution's experts. If the jury was precluded from considering such evidence, it was less likely to accept the defense experts' opinions.

There was expert testimony that the fact a defendant suffers from delusions is potentially relevant to show he lacked understanding of the wrongfulness of his acts. Dr. Kojian acknowledged that delusions or hallucinations "could impact [a defendant's] ability to know whether what they did was wrongful." There was evidence Carter experienced delusions when untreated.[11] Thus, whether Carter was being treated immediately preceding the crime was relevant to whether he had decompensated and become delusional, a factor relevant to analysis of *M'Naghten*'s "knowledge of wrongfulness" prong.

Finally, the experts all based their conclusions regarding the wrongfulness prong in significant part on Carter's own statements and descriptions of the crime. Evidence of Carter's past treatment, or lack thereof, was relevant to the jury's evaluation of these opinions. Morris testified Carter was a poor historian who was unable to provide relevant information. He explained: "I considered the fact he'd been untreated for multiple years. There's cognitive decline related to schizophrenia. People get dumbed down[,] become more simplistic," and Morris wondered whether this was true in Carter's case. Thus, the long-term failure to treat might have provided an alternative explanation for Carter's inability to articulate any psychotic underpinning for his crime.

---

[11] There was evidence Carter suffered from delusions on the evening preceding the murder: he denied that his brother was actually his brother and he took an oatmeal bath, an activity he had previously associated with the delusion he was "washing off the demons." There was also evidence he slapped a three-year-old neighbor shortly before the murder and made unpleasant faces at a four-year-old girl; Dr. Rothberg opined that these activities, when coupled with other evidence, could suggest Carter's delusions extended to a belief that young girls "weren't who they actually were." During other periods when he was not medicated, he suffered from delusions that bugs were coming out of his legs; he was a music star and his family was attempting to steal the rights to his work; and he had been married and divorced and had a child who died due to breathing problems.

14

In sum, the evidence of prior treatment and medication was relevant, but the trial court's response to the jury's question potentially precluded the jury from considering it.

d. *Prejudice*

The People argue that any error in the trial court's response was harmless. They posit that any error must be evaluated under the *Watson* standard applicable to state law instructional errors. Under the *Watson* standard, prejudicial error is shown where it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (*People v. Wilkins* (2013) 56 Cal.4th 333, 350-352; *People v. Watson* (1956) 46 Cal.2d 818.) A " ' "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' " (*People v. Wilkins, supra,* at p. 351.) Carter argues that the error is subject to the federal *Chapman* standard, which requires reversal unless it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Wilkins, supra,* 56 Cal.4th at p. 350.) We need not determine which standard applies here, because the error was prejudicial under either.

The People urge that the evidence Carter knew his conduct was wrongful was overwhelming, in that he attempted to hide the body and the murder weapon and flee from police; he never told anyone that he killed Mireya because he believed she was a demon, or because voices commanded him to do so; and defense counsel never argued the lack of treatment was a significant factor.

We agree there was certainly sufficient, even persuasive, evidence supporting the jury's sanity finding. But that evidence was not necessarily overwhelming. Two experts opined Carter was sane at the time of the murder; two opined he was insane. The two defense experts countered the prosecution experts' views on the evidence suggesting consciousness of guilt. All the experts premised their views on review of years of psychiatric records, and all explained the bases for their opinions.

Carter's first jury deadlocked, with eight jurors finding he was insane. The jury's question in the second sanity phase trial was asked simultaneously with its query as to the

15

proper procedure if it was unable to come to a unanimous decision. The jury rendered its verdict 10 minutes after the trial court answered the jury's question, suggesting the trial court's response was quite significant to the jury's analysis. In light of the foregoing, we cannot say the error was harmless, in that it is reasonably probable the jury would have rendered a more favorable verdict had it been properly instructed.

DISPOSITION

The jury's finding that Carter was sane when he committed the murder is reversed. The matter is remanded for further proceedings consistent with the opinions expressed herein. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, Acting P. J.

We concur:

LAVIN, J.

HOGUE, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.