Filed 7/29/15  P. v. Rubio CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B254665 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA387318) |
| v. | |
| OSBALDO LUNA RUBIO, | |
| Defendant and Appellant. | |

APPEAL from judgment of the Superior Court of Los Angeles County, Clifford L. Klein, Judge.  Affirmed.

Ted E. Thompson for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Elaine F. Tumonis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## Background

Appellant Osbaldo Luna Rubio was charged by information, in count 1, with assault on Bernardo Hernandez (Hernandez) with a deadly weapon (metal pipes and sticks) (Pen. Code, § 245, subd. (a)(1)); in count 2, with assault on Hernandez by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(1)); and in count 3, with false imprisonment of Hernandez by violence (Pen. Code, § 236).[1]  Count 4 of the information charged Rubio with assault with a deadly weapon (metal pipe) on Francisca Hernandez (Francisca).[2]  (§§ 245, subd. (a)(1); 1192.7, subd. (c).)

As to counts 1 and 2 it was alleged that in the commission of the offenses Rubio personally inflicted great bodily injury on within the meaning of section 12022.7, subdivision (a), causing the offense to become a serious felony within the meaning of section 1192.7, subdivision (c)(8).  As to counts 2 and 3 it was alleged that in the commission of the offenses Rubio personally used a deadly and dangerous weapon (pipes and sticks) (§ 12022, subd. (b)(1)), causing the offenses to be serious felonies (§ 1192.7, subd. (c)(23)).  It was alleged that the offenses charged in counts 1, 2, and 3 are each a serious felony, a violent felony, or an offense requiring registration under subdivision (c) of section 290, and service of prison custody in state prison.  (§ 1170, subd. (h)(3).)

The charged offenses occurred on August 1, 2011, after Hernandez and Francisca[3] had parked their red Toyota truck in front of the driveway of Rubio's father-in-law, Eliseo Barragan, Sr., while Hernandez looked for someone they had intended to meet at that address.  When Barragan and his daughter Mary returned from grocery shopping to find Hernandez's truck blocking his driveway, Barragan pulled his white pickup behind the red truck, telling Hernandez and Francisca (whom he did not know) to move the

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

[2] We identify Francisca and others who share family names by their first names in order to avoid confusion; we mean no disrespect.

[3] Hernandez and Francisca identified their relationship as that of an unmarried couple.

2

truck. After Hernandez refused to move his truck (Francisca testified he could not, because Barragan's white pickup was blocking it), Barragan became angry. The specifics of the ensuing argument (which were much disputed) are not relevant to this appeal; suffice it to say that by all accounts, things got out of hand.[4]

At some point Barragan moved his white pickup; Barragan and Mary went into the house, returning with a pen and paper to record the truck's license number; Hernandez moved the red truck, parking in the street some distance away. According to Francisca, Barragan was angrily calling Hernandez and Francisca names, threatening to kill them "like dogs," and making threatening gestures toward Francisca. And according to Mary (who Francisca said was trying to calm the situation), Hernandez retrieved a large hammer from his truck, swinging it toward Barragan a number of times. One or more neighbors became involved in the dispute, some of them physically. Barragan's wife and daughter said they called 911 several times.

Appellant Rubio was not present during the incident. Soon after Hernandez and Francisca left the scene, Barragan and his wife were joined by their family, apparently having been called by Mary. Their daughter Martha was already there when her sister Angelina arrived with her husband, appellant Rubio. Soon afterward their sons Jesse and Eliseo, Jr., arrived.

When they left the scene Hernandez and Francisca drove to a police station to report Barragan's threats, then to a street named Victoria Park. Before Hernandez and Francisca got out of the truck, however, three vehicles approached and simultaneously surrounded them. Barragan's white pickup truck, driven by Jesse and accompanied by others, rammed the front of Hernandez's red truck; Rubio drove a black SUV into the rear of the red truck; and another red vehicle drove next to and into Hernandez's truck, blocking the driver-side door and preventing it from driving away and pushing it onto the curb.

---

[4] We state the relevant facts, viewing the record and resolving all conflicts in the evidence and indulging in all inferences in the light most favorable to the judgment. (*Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 291, 308.)

3

About six to eight men emerged from the cars, and at least two of them broke the driver-side window of Hernandez's truck and began hitting Hernandez in the face with pipes, then pulling him from the truck. When Hernandez broke free and ran, the men chased him about two blocks away, continuing to hit him and pushing him to the ground. Whether Rubio was among those participating in the initial attack was disputed, but when Francisca caught up with the group they had Hernandez on the ground, hogtied, surrounded by four men and being kicked by Rubio.

Francisca saw Hernandez was not moving, and was being kicked. She pushed one of the men, telling him to stop hitting Hernandez and to stop holding him down with his knee, because "he hasn't done anything." To that, the attacker replied, "It's not true. He raped my sister"—a charge that Francisca denied.

When the police arrived after being called by neighbors, Hernandez remained lying face down on the ground, still tied with a belt, being hit by Rubio and two other of the attackers. The others had left, taking the white pickup and the red car that had surrounded Hernandez's red truck, and the pipes used in the attack.

Hernandez was seriously injured in the attack and was taken to the hospital by paramedics. He lost a tooth, some of his other teeth were loosened, and his jaw was dislocated. He had injuries to his side, back, stomach, and hand, and a gash and cuts to his head.

Rubio testified in his own defense. He testified that after being told by his wife's family members about the incident in front of Barragan's house, he and Barragan left "to find the red pick-up and obtain information and give it to the police." When they saw and followed the red truck he did not himself call the police, but he testified that he gave his sister the license number on the telephone, to give to the police. They followed the red truck to Victoria Park.

According to Rubio, after pulling up behind the red truck where it was stopped, he remained sitting in his SUV while he watched—surprised—while others (Jesse, Elisio, Jr., a friend of theirs, and eventually Barragan) hit Hernandez with pipes and sticks, and chased him from the red truck. He testified that he then drove his SUV toward the group,

4

getting out of his car to talk to Francisca, who was screaming not to hit Hernandez. Rubio told her, "Ma'am, they're not going to hit him. They're going to detain him until the police arrives [*sic*]."

Rubio testified that when he had located and followed the red truck, he had wanted the police to come "and arrest that person for the harm they had caused." That harm, he understood, was that Hernandez and Francisca "had fought and they had hurt" Barragan's daughter Mary, and that Barragan had also fought and "had had problems" with Hernandez. Rubio denied ever approaching or touching Hernandez or hitting him; denied encouraging the others to do so; and denied that Hernandez's hands were bound when the police arrived. Although both he and Barragan had phones with them, neither called the police at any time.

Rubio was tried before a jury. At the close of the prosecution's case-in-chief the court granted his motion under section 1118.1 for acquittal on count 4 (assault with a deadly weapon on Francisca), and acquittal on the charge as to counts 2 and 3 of using a deadly and dangerous weapon.

The jury found Rubio guilty of the offenses charged in counts 1, 2, and 3. As to count 1 (assault with a deadly weapon) it found not true the allegation that Rubio personally inflicted great bodily injury on Hernandez. As to count 2 (assault by means of force likely to produce great bodily injury) the jury found true the allegation that Rubio personally inflicted great bodily injury. The court overruled Rubio's objection that the jury's findings—that the section 12022.7, subdivision (a) allegations are not true as to count 1, but are true as to count 2—are inconsistent. The court denied Rubio's motions for new trial, and for probation.

The court sentenced Rubio on February 24, 2014, to state prison for a total term of five years. Identifying count 2 as the base term, the court sentenced Rubio to the low term of two years as to that count, adding an additional and consecutive sentence of three years for the finding of personal infliction of great bodily injury. (§ 12011.7, subd. (a).) As to count 1, the court sentenced Rubio to the low term of two years in state prison, staying the sentence under section 654. As to count 3, the court sentenced Rubio to the

5

midterm of two years, to be served concurrently with the count 2 sentence. It denied Rubio's request for a stay of the two-year count 3 sentence under section 654, imposed various fines and fees, and allocated presentence custody and conduct credits.

Rubio filed a timely notice of appeal on February 24, 2014.

## Discussion

Rubio appeals his conviction on three grounds: (1) that the trial court erred by instructing the jury on an aiding-and-abetting theory for the great-bodily-injury allegations; (2) that the court erred by refusing to instruct the jury regarding the requirements for a citizen's arrest; and (3) that the court erred by refusing to stay his sentence as to count 3, under section 654. We find no error.

**1. The trial court did not err by instructing the jury on an aiding-and-abetting theory regarding the great-bodily-injury allegations.**

Count 1 of the information charged Rubio with assault on Hernandez with a deadly weapon, and count 2 charged him with assault on Hernandez by means of force likely to cause great bodily injury. The count 1 charge related to the evidence that Rubio had participated in the attack on Hernandez using metal pipes and sticks; the count 2 charge related to the evidence that Rubio had kicked Hernandez in the face as he lay tied on the ground. Counts 1 and 2 of the information each had a special allegation that Rubio "personally inflicted great bodily injury upon Bernardo Hernandez . . . ."

The court noted during its initial discussion with counsel about jury instructions that for a finding of guilt as to counts 1 and 2, and the great-bodily-injury special allegation, a finding that Hernandez acted with a general intent would be sufficient; but for a finding of guilt on either of these counts as an aider and abettor, a specific intent would be required.[5]

_____

[5] The court explained its intended instruction: "I've taken [CALCRIM No.] 252, which is union of act and general and specific intent together, and you can see what I've done. I've kept the first paragraph as general criminal intent, and said in the consecutive paragraph, 'the following crimes and allegation require specific intent or mental state if based on aiding and abetting commit the charged crime. For you to find the person guilty

6

The court initially instructed the jury that for it to find guilt as to counts 1 or 2, or to find the allegation of infliction of great bodily injury true, it must find that Rubio not only committed the prohibited act, but that he did so "with wrongful intent." It instructed on the proof required to establish wrongful intent. And it instructed that the crimes charged in counts 1, 2, and 3, as well as the allegations of infliction of great bodily injury, each require "specific intent or mental state if based on aiding and abetting to commit the charged crime . . . ."

During a subsequent break in the proceedings, however, the court explained to counsel that it had erred in its modification of the CALCRIM No. 252 instruction's language: "I instructed the jury that they could find the great bodily injury allegation, which has to be personally inflicted under an aiding and abetting theory. That is clearly incorrect," for it permitted the great-bodily-injury allegation to be established by proof of aiding and abetting, rather than personal infliction. The court stated its intention to reinstruct the jury on the issue, without including aiding and abetting. "And hopefully, since it could be a little confusing, you might want to mention that in argument."

The next morning the court explained to the jury that its instruction dealing with general and specific intent was mistaken, and it read its corrected instruction. The corrected instruction told the jury that a general criminal intent was required to establish the crimes of assault with a deadly weapon, assault by means likely to produce great bodily injury, and false imprisonment by violence; but a specific intent was required in order to find guilt of those offenses by aiding and abetting. The instructions, as corrected, thus properly told the jury that it could find Rubio guilty of the assault and false imprisonment charges in counts 1, 2, and 3 only if it found Rubio acted with specific intent; and that it could find true the allegations of great bodily injury if Rubio had personally inflicted such injury on Hernandez. Omitted was the erroneous implication that the great bodily injury allegation could be found true based on an aiding-and-abetting theory.

---

of aiding and abetting of these crimes or find the allegation true, the person must not only commit the prohibited act, but must do so with specific intent and/or mental state.'"

7

Counsel for the prosecution argued to the jury that the evidence showing Rubio's participation with the other attackers would be enough to establish his guilt of the crimes of assault with a deadly weapon and assault by means likely to produce great bodily injury, as an aider and abettor—even if the jury were uncertain whether Rubio had personally hit Hernandez with a pipe. But consistent with the corrected instruction, in order to establish the truth of the great-bodily-injury allegation, she explained, the jury must conclude not just that "two or more people acting at the same time assaulted Mr. Hernandez, inflicted great bodily injury on him," but also "that the defendant personally used physical force against Mr. Hernandez during that group assault."

The argument of Rubio's counsel to the jury stressed uncertainties in the evidence identifying Rubio as a direct participant in the attack. "The way I see the evidence, this is an eyewitness identification case and an aiding and abetting case." And he specifically reminded the jury that under the court's instructions, to be guilty of the charged offenses on an aiding-and-abetting theory ("which I would submit is the only possible reasonable theory for the People in this case"), the jury would be required to find that Rubio acted with specific intent.

The prosecutor's closing argument directly addressed that contention. Even if the jury were to adopt the defense theory that Hernandez's identification of Rubio as the one who kicked him was mistaken, she argued to the jury, that would absolve Rubio only of the great-bodily-injury allegation, "which requires that he personally inflicted an injury to the defendant -- to Mr. Hernandez. That is the only thing." In other words, if the jury were to be unable to conclude that Rubio personally kicked Hernandez in the face, he still could be guilty of the crimes of assault with a deadly weapon and assault by means likely to produce great bodily injury, as an aider and abettor.

That the jury understood and followed the court's corrected instruction is not just the rebuttable presumption required by the law (*People v. Hovarter* (2008) 44 Cal.4th 983, 1005); it is also shown by the verdicts. The jury found Rubio guilty of assault with a deadly weapon as charged in count 1, but found not true the allegation that in so doing he personally inflicted great bodily injury on Hernandez—indicating that it found Rubio

8

guilty on the count 1 charge as an aider and abettor, not for his personal participation in the attack. But it also found him guilty of the charge in count 2, assault by means likely to produce great bodily injury, and found true the allegation that in that assault—kicking Hernandez as he lay on the ground—Rubio personally inflicted great bodily injury on Hernandez. These findings are wholly consistent with the absence of direct evidence that Rubio personally hit Hernandez with a pipe or stick, but the presence of ample (though disputed) evidence that he did personally kick Hernandez in the face, injuring him, while he was hogtied on the ground.

These seemingly contradictory verdicts therefore are not contradictory at all. There was no error in the instructions, no jury confusion, and no contradiction in the verdicts.

## 2. The trial court did not err by refusing to instruct the jury regarding the law relating to citizen's arrest.

Rubio contends that there was evidence that Hernandez had assaulted Barragan by swinging a hammer at him during the incident in front of Barragan's house. Rubio testified that he and his father had gone looking for Hernandez and his red truck in order to report its location to the police and to make a citizen's arrest "pending the arrival of the police." He testified that when he saw the red truck he had told his sister on the phone to call the police. And he testified that when Francisca told him to have the other attackers stop hitting Hernandez, he told her they were not hitting him but merely were holding him for the police.

The existence of this evidence, Rubio contends on appeal, required the trial court to heed his request for an instruction to the jury on the law relating to citizens' arrests. "The trial judge, in refusing to give the requested instruction took away from the jury the question of whether in fact a citizen's arrest was being made. The instruction should

9

have been given as there was ample evidence that would support a jury's finding in this case that that was indeed what the appellant's conduct constituted."[6]

A trial court's duty is to instruct the jury on the general principles of law relevant to the issues raised by the evidence, including to instruct on every theory of defense supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) And the court must give "pinpoint" instructions—instructions relating particular facts to a legal issue—must be given when supported by evidence and requested by the defendant. (*People v. Wilkins* (2013) 56 Cal.4th 333, 348-349.)

Counsel for Rubio asked that the jury be instructed on the law relating to citizen's arrest, but no instruction regarding citizens' arrests was proffered, and no provision of law concerning citizens' arrests was cited in the trial court. Nor is any such instruction or law identified by appellant's brief in this court.[7] Moreover, the appellant's argument is meritless even if we were to assume (without any suggestion by the appellant) that some unidentified instruction could have been crafted to meet the circumstances of this case. That is because—as the trial court concluded—there is simply no evidence that Rubio made, or was attempting to make, a citizen's arrest of Hernandez.

The law provides in section 835 that "[a]n arrest is made by an actual restraint of the person, or by submission to the custody of an officer. The person arrested may be subjected to such restraint as is reasonable for his arrest and detention." It provides in section 837 that a citizen's arrest may be made for a public offense committed or attempted in the arrestor's presence, for a felony committed outside of the arrestor's

---

[6] Appellant's entire argument on this point is devoid of citation to any portion of the transcript on appeal, or to any case law or statutory provision. (See Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).)

[7] Two standardized CALCRIM instructions concern the law relating to citizens' arrests. CALCRIM No. 508 instructs that a killing that occurs during an attempted citizen's arrest for a violent felony may support an acquittal when the defendant is charged with murder, manslaughter, or attempted murder or manslaughter. CALCRIM No. 1226 instructs that a person making a lawful citizen's arrest is not guilty of kidnapping.

presence, or when a felony has been committed and the arrestor has reasonable cause to believe the person arrested is the perpetrator. And it provides in section 841 that in the absence of specified circumstances, "[t]he person making the arrest must inform the person to be arrested of the intention to arrest him, the cause of the arrest, and the authority to make it . . . ." Among the circumstances that can justify an exception to these requirements are "when the person making the arrest has reasonable cause to believe that the person to be arrested is actually engaged in the commission of or an attempt to commit an offense; when the person to be arrested is pursued immediately after commission of the offense; or after an escape. (§ 837.)

Rubio was not present, and did not witness, any alleged or claimed assault during the incident in front of Barragan's house (although he says he was later told about it by his family). No one who was present at the incident in front of Barragan's house, where Rubio claimed the assault supposedly occurred, made or attempted to make a citizen's arrest. (Rubio's mother and sister testified they called 911, but they did not say they did so as part of an attempted citizen's arrest.) Rubio testified that his intention in locating and following the red truck was to identify Hernandez's truck for the police—not that his intention was to make a citizen's arrest. And he also testified that although he had a cellphone with him, he did not call the police after locating the truck, or as he sat silently watching in claimed surprise as his relatives beat Hernandez with pipes and dragged him from his truck. But calling the police—even if he had done so, or even if the jury believed that he had told his wife to do so, as he testified—does not constitute either a citizen's arrest, or even an attempted citizen's arrest.

Thus the evidence could not support any instruction of the sort requested by Rubio's counsel, and the jury's verdicts negate any possibility that the trial's outcome might have been more favorable to Rubio if the jury had received such an instruction. (*People v. Wilkins*, *supra*, 56 Cal.4th at p. 349; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

11

**3. The trial court properly imposed a concurrent term for appellant's count 3 false imprisonment conviction.**

For count 1 the court sentenced Rubio to state prison for two years, plus an additional and consecutive three-year sentence for the finding of personal infliction of great bodily injury. For count 3, false imprisonment, the court sentenced him to two years, to be served concurrently with the count 2 sentence. Rubio appeals from the trial court's denial of his request for a stay of the count 3 sentence under section 654, instead of a concurrent term. His entire argument is stated in one short sentence embodying his conclusion, without explanation and unadorned by citation to the record or the law. Presumably his contention on appeal is that the count 2 assault and the count 3 false imprisonment convictions constitute a single, indivisible offense for which separate punishment is prohibited.

Section 654, concerning alternative punishments, provides (in relevant part) that "[a]n act . . . that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act . . . be punished under more than one provision." The statute's intention is to ensure that the defendant's punishment is "commensurate with his culpability." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Taken literally, it applies only where the punishment arises from multiple statutory violations produced by the same act or omission. That has traditionally meant that a defendant may be punished only once if all the offenses of which he or she was convicted were incidental to a single objective, or were the means of accomplishing that objective. (*Id.* at p. 335.) But it has also long been extended to cases in which several offenses are committed during "'a course of conduct deemed to be indivisible in time.'" (*Ibid.*; *People v. Beamon* (1973) 8 Cal.3d 625, 639.)

"'"'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support [the] finding the defendant formed a separate intent and objective for each offense for which he was sentenced.'"'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 886; *People v. Coleman*

12

(1989) 48 Cal.3d 112, 162.) We therefore review the trial court's ruling on the issue under a substantial evidence standard. (*People v. Johnson* (1969) 270 Cal.App.2d 204, 208-209 [whether shot fired as defendants drove away was divisible from robberies is question of fact decided by trial court].)

The trial court was justified in determining that Rubio does not come within section 654's limitation on multiple punishments. Objectively, Rubio could not establish that the count 2 and count 3 offenses were committed during "'a course of conduct deemed to be indivisible in time,'" (*People v. Harrison*, *supra*, 48 Cal.3d at p. 335) or that the offenses "shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon*, *supra*, 8 Cal.3d at p. 639.) The false imprisonment was not merely an incidental part of the assault by force likely to produce great bodily injury, nor was the assault by force incidental to the false imprisonment. The evidence was more than substantial (indeed, unequivocal) that the count 2 assault on Hernandez—kicking him in the face—was separated both by time and in kind from the false imprisonment— hogtying him and holding him to the ground. Hernandez could have been kicked in the face whether he was or was not hogtied; he could also have been hogtied without being kicked. And as far as the evidence shows, the offenses were also at least to some extent temporally distinct, for he was still tied and being held down by Rubio when the police arrived.

The evidence therefore supports the trial court's finding that the count 2 assault and the count 3 false imprisonment were not merely incidental parts of the same offense, and that their separate punishment is not prohibited. (*People v. Hopkins* (1975) 44 Cal.App.3d 669, 677-678 [striking tied victim constitutes offense separate from robbery]; *People v. Johnson*, *supra*, 270 Cal.App.2d at p. 209 [gratuitous firing of gun at robbery victim during flight from scene constitutes separate offense].)[8] Rubio was more culpable,

_____

[8] The court in *People v. Hopkins*, *supra*, 44 Cal.App.3d 669, held that three offenses for which the defendant was convicted (burglary, robbery, and malicious destruction of telephone equipment) were incidental to an indivisible transaction with a single objective: the robbery; but the assault on the victim by means of force likely to

13

and more deserving of punishment, for having committed both offenses—assault by means of force likely to cause great bodily injury, and false imprisonment—rather than just one of those offenses.  The court did not err in refusing to apply section 654 to stay the sentence on the false imprisonment count.

**Disposition**

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.

---

produce great bodily injury (striking the victim while she was tied) was distinct from that course of conduct and objective, and was therefore subject to separate punishment.  (*Id.* at pp. 677-678.)