Filed 9/30/16  P. v. Zepeda CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE FELIX ZEPEDA,<br><br>    Defendant and Appellant. | G050810<br><br>(Super. Ct. No. 12CF1289)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

Jose Felix Zepeda appeals from a judgment after a jury convicted him of first degree murder, kidnapping for ransom, and conspiracy to sell a controlled substance and found true special circumstance and enhancement allegations. Zepeda argues the trial court erred in instructing the jury and erred by imposing a parole revocation restitution fine. Zepeda's contentions are meritless, and we affirm the judgment.

FACTS

*Substantive Facts*

In April 2012, Leder Sanchez, Juan Carranza, and Alma Trinidad talked to Agustin Velasquez, a taco vender, about buying drugs. One day later that month, Sanchez told Velasquez that he wanted to buy five pounds of methamphetamine and Carranza told Velasquez that he wanted to buy five pounds of cocaine. Velasquez called another taco vender, Kain Espinoza, who had previously told Velasquez to contact him regarding anyone who wanted to buy drugs. Espinoza and his girlfriend, Rocio Badilla, sold drugs for Zepeda. Espinoza called Zepeda about the potential sale. Zepeda gave Espinoza a price and told him to meet with the prospective buyers.

The next morning, Espinoza met Sanchez and Carranza at Velasquez's house in Montebello and stated he would sell them three pounds of methamphetamine for $8,900 a pound. Espinoza said he would return with the drugs around 4:00 p.m.

Between 11:00 a.m. and 1:00 p.m., Carranza called Mario Ortega several times, but Ortega initially did not answer the calls in part because he thought Carranza and Sanchez were involved in drugs. Ortega eventually answered his phone, and Carranza asked him for a favor. Ortega declined, stating he had to go to the bank.

As Ortega exited the bank, Sanchez and Carranza confronted him. Sanchez and Carranza again asked Ortega for help. When Ortega declined, Sanchez stated, "You just do it or it's going to go bad." Ortega agreed to help them. Sanchez and Carranza told Ortega to follow them while they collected some money.

Around 4:00 p.m., Zepeda, Espinoza, and a man named "Noe" drove in Zepeda's white Ford Focus (the Ford) to Velasquez's house. When Carranza and Sanchez did not show up, Espinoza told Velasquez to call them; they said they would be there in about 20 minutes. Espinoza refused to wait and Zepeda, Noe, and Espinoza drove away with the drugs.

Minutes later, Sanchez and Carranza arrived at Velasquez's house in a Jeep Cherokee (the Jeep) and went inside the house. Ortega followed in his car and parked about 200 yards away. Velasquez called Espinoza. Zepeda, Noe, and Espinoza returned to Velasquez's house. Espinoza went inside while Zepeda and Noe waited in the car.

Sanchez and Carranza asked Espinoza if he had the drugs. Espinoza said, "Yes, I have the three pounds[,]" and put three packages on the table. Carranza opened one package with a knife. Carranza and Sanchez sampled the contents, and Sanchez told Carranza to get the money from the truck. Carranza left the house, returned with a gift bag, emptied the bag's contents on the table and said, "Here is the money." When Espinoza reached for the money, Sanchez and Carranza drew pistols, threw Espinoza and Velasquez on the floor, and said, "We're going to kill you, and we're going to take everything." While Sanchez held the gun to Velasquez's temple, Carranza put his gun in Espinoza's mouth and asked Sanchez if he should kill Espinoza. Sanchez said, "No. Put everything in the bag, and let's go." Sanchez and Carranza bound Espinoza and Velasquez with shoelaces and warned they would kill them if they went outside. Carranza and Sanchez left Velasquez's house with the drugs, the cash, and Espinoza's cell phone.

Velasquez quickly freed himself. Espinoza told Velasquez to go to Zepeda's car. Velasquez went outside and saw Carranza and Sanchez drive away in the Jeep with Ortega following in a white car. Velasquez got into Zepeda's car and told Zepeda and Noe about the robbery. Zepeda followed the Jeep and Ortega's car. When they lost sight of the Jeep, Zepeda followed Ortega's car and eventually cut him off.

Zepeda and Noe knocked on the car's window and ordered Ortega to get out, which he did.

After Noe parked Ortega's car, he and Zepeda asked Ortega to explain what happened, who the other men were, and why he was there. Ortega said he had "no clue" and he was ordered to follow the two men. Ortega heard Zepeda talking on the phone, saying something to the effect of "I caught someone[,] [c]ome" and "[W]hat do we do?" Noe took Ortega's phone and wallet and shoved him into Zepeda's car's backseat. Zepeda drove away with Velasquez, Noe, and Ortega.

During the ride, Carranza called Ortega on his cell phone. Noe put the call on speaker phone. Carranza asked Ortega where he was. Ortega, following Noe's instructions, said he was lost on the freeway. Carranza told Ortega to go home and they would give him his share there. Zepeda drove Velasquez, Noe and Ortega to Velasquez's house where they met Espinoza. Ortega remained in the car while the others congregated outside. Zepeda asked Espinoza why he allowed Sanchez and Carranza to rob him. Espinoza replied the men were armed. Zepeda warned Espinoza, "If you have something to do with this, you're going to die. You're going to die and your whole family will die." Zepeda told Espinoza to do what he was told and the robbers were going to die because they were "rats."

Zepeda and Noe made phone calls, and a gray sports utility vehicle (the SUV) with three men arrived at Velasquez's house. Two of the men took Ortega from Zepeda's car to the SUV. Ortega got in the SUV's backseat because he was scared. The SUV driver said, "We should just burn him alive in the garage here, and, you know, leave him there, or leave him there inside the garage door in the car." Other people also got inside the SUV with Ortega, threatened him, cussed at him, and demanded he tell them where Sanchez and Carranza were. At one point, one man appeared to be giving Ortega's address to someone over the phone.

4

Ortega eventually agreed to take Zepeda and the others to Carranza's home in Anaheim after they promised Ortega they would let him go if he did so. The group planned to kill Carranza and Sanchez and recover the drugs. Zepeda retrieved his gun and gave it to Noe. The SUV driver, Noe, Ortega, and another man drove to Anaheim. Pursuant to Zepeda's instructions, Espinoza obtained his truck and a shotgun with Badilla's assistance. Espinoza, Badilla, and Velasquez followed in his truck. Zepeda followed in the Ford but remained out of sight.

When the vehicles neared an apartment complex, a man in the SUV said, "Oh, that's them." Ortega confirmed that Carranza was the man getting into and driving away in the Jeep. Espinoza directed Badilla, who was driving his truck, to follow the Jeep. Badilla turned the truck around and tried to catch the Jeep but lost sight of it.

Meanwhile, at the apartment complex, the SUV driver said, "Oh, there is another guy," when Sanchez walked out of the complex. Someone else in the SUV said, "It's him. Kill him." The SUV driver made a quick U-turn and stopped, and the SUV driver and Noe got out of the SUV. The SUV driver fired several rounds at Sanchez, returned to the car, and said, "I got him. I got him[,]" as they drove away.

When a police officer arrived he found Sanchez lying on the ground alive but bleeding profusely. Sanchez subsequently died from gunshot wounds to his back. Police officers recovered six shell casings and Sanchez's cell phone at the scene.

After the shooting, Ortega, following orders, called Carranza to locate him. Carranza told Ortega that he was in Santa Ana but did not specify where. The SUV driver drove to Espinoza's sister's house and they met Zepeda, Velasquez, Espinoza, and Badilla. Inside, the men continued to threaten Ortega for 30 to 40 minutes and then moved him to the back of the Ford with Velasquez to watch him. At one point, Ortega's cell phone received a phone call from Maria Serrano, Carranza's cousin. Noe brought the phone to Ortega and had him place the call on speakerphone. Serrano told Ortega that Sanchez had been killed, that she had the drugs, and that she was at a church with her

5

children. After the call, Zepeda, Noe, Velasquez, and Ortega drove to Anaheim in Zepeda's car; Espinoza and Badilla followed in another car. During the ride, Serrano informed Ortega of her whereabouts on the phone. At one point, Ortega told Serrano to give the drugs, which Trinidad had placed in a diaper box, to a woman who would contact her. Badilla met Serrano, and Serrano gave her the diaper box with the drugs. Both cars returned to Espinoza's sister's apartment. Ortega and Velasquez remained in Zepeda's car while the others went inside the house with the drugs. After Noe weighed the drugs, Zepeda and Noe informed Espinoza and Velasquez that they would need to pay them $5,000 for some missing drugs.

As Zepeda left the apartment, he told Velasquez and Espinoza, "he's [Ortega's] all yours. Just give us the money and do whatever you want with him." Velasquez and Espinoza initially told Ortega that he was responsible for the entire debt. Later, however, they said they would let him go but he needed to produce at least $2,500 by the following day. They also warned Ortega that they would kill him and his family if he did not obtain the money. Velasquez, Espinoza, and Badilla eventually drove Ortega to his car, which was at a casino parking lot. They gave Ortega his car keys but not his cell phone or wallet. Before releasing Ortega, they told him the following, "You already know those guys. You know how they are. Don't try anything, otherwise you know what happens." Ortega drove home and slept. The next day, he went to work at a cell phone store. He did not call the police because he was "very scared."

A detective contacted Ortega at work. Police officers had determined Sanchez bought his cell phone from Ortega. Ortega eventually told the detective what happened. Ortega then had a series of police-monitored text message and phone conversations with Velasquez. Pursuant to the police officers' instructions, Ortega told Velasquez that he had a partial payment. Police officers placed an unmarked police car with marked money inside of it in a Walmart parking lot, and an officer posing as Ortega

6

gave Velasquez directions to the car.  When Badilla came to collect the money from the car, police detained her.

Police officers later arrested Zepeda, who denied knowing about the incident, knowing the people involved in it, and owning a white Ford.  During a search of the Ford and Zepeda's home, police officers found car insurance documents and a traffic ticket with Zepeda's name of them, a notebook with pay/owe documents common amongst drug dealers, two handgun magazines, and ammunition.  The ammunition was the same type and brand as the expended shell casings the police found where Sanchez was shot.

*Procedural Facts*

An amended information charged Zepeda with murder (Pen. Code, § 187, subd. (a); all further statutory references are to the Penal Code, unless otherwise indicated) (count 1), kidnapping for ransom in a manner that exposed Ortega to death or harm (§ 209, subd. (a)), and conspiracy to sell a controlled substance (§ 182, subd. (a)(1)).  As to count 1, the information alleged Zepeda committed the murder during the commission of kidnapping.  (§ 190.2, subd. (a)(17)(B).)  With respect to count 3, the information alleged there was more than one kilogram of methamphetamine.  (Health & Saf. Code, § 11370.4, subd. (b)(1).)  Finally, the information alleged Zepeda served a prior prison term.  (§ 667.5, subd. (b).)

At trial, Velasquez testified that in exchange for his truthful testimony he agreed to plead guilty to conspiring to sell more than a kilogram of methamphetamine and serve a five-year sentence.  Espinoza testified that in exchange for his truthful testimony the prosecution agreed to him serving a five-year sentence for his involvement in this case.

*Closing Arguments & Jury Instructions*

At a hearing on the jury instructions, the prosecutor requested the trial court instruct the jury with CALCRIM No. 731, "Special Circumstances:  Murder in

7

Commission of Felony—Kidnapping with Intent to Kill." Defense counsel did not object, but relying on the bench notes, counsel requested the court also instruct on causation, i.e., the logical connection between the kidnapping and the death. (Former CALCRIM No. 731 (2013 ed.), pp. 473-474.) After a brief exchange between the court and the prosecutor, the court stated, "If causation is an issue, then we need to give [CALCRIM No.] 240 *also*." (Italics added.) Again relying on CALCRIM No. 731's bench notes, defense counsel requested the court instruct the jury with CALCRIM No. 240, "Causation." (Former CALCRIM No. 731 (2013 ed.), p. 473.) The prosecutor argued causation was not at issue because there was no dispute the SUV driver shot Sanchez twice in the back. Defense counsel replied the issue was the kidnapping not the shooting.

After the court researched the issue at a short recess, it denied defense counsel's request to instruct the jury with CALCRIM No. 240 because it did not "comport with the evidence in this case." Defense counsel inquired whether he could argue "the kidnapping was not the cause of the homicide[,]" and there had to be a causal relationship between them. After the prosecutor said the court could not preclude the argument but that it was not the law, the court stated, "I think it's a proper argument." Defense counsel responded, "You said proper?" The court answered, "[I]t is a proper argument based on the facts of this case." The court concluded, "If you want to argue that to the jury, you can do that. I'm not sure how you're going to get there, but I'm not going to tell you not to do it." The court did not expressly rule on defense counsel's first request—the logical connection requirement. Defense counsel did not request the court rule on this request.

As relevant here, the trial court instructed the jury with the applicable theories of murder, i.e., malice aforethought and felony murder. As to felony murder, the court instructed the jury with CALCRIM No. 540B, "Felony Murder: First Degree— Coparticipant Allegedly Committed Fatal Act." With respect to the special circumstance,

8

the court instructed the jury with CALCRIM Nos. 703, "Special Circumstances: Intent Requirement for Accomplice After June 5, 1990," and 731, "Special Circumstances: Murder in Commission of Felony—Kidnapping with Intent to Kill (After March 8, 2000)." Finally, the court instructed the jury with CALCRIM No. 1202, "Kidnapping: For Ransom, Reward, or Extortion."

During closing argument, the prosecutor acknowledged Zepeda was not the shooter. The prosecutor argued Zepeda was guilty of first degree murder under the following two theories: felony murder, and willful, deliberate, and premeditated murder as an aider and abettor or conspirator. Defense counsel argued the prosecution's three key witnesses, Velasquez, Ortega, and Espinoza, were not credible witnesses.

*Verdicts & Sentence*

The jury convicted Zepeda of all the counts and found true the special circumstance and enhancement allegations. At the sentencing hearing, Zepeda admitted he served a prior prison term. The trial court sentenced Zepeda to a determinate term of six years in prison as follows: three years on count 3 and a consecutive term of three years on the quantity enhancement. The court also sentenced him to an indeterminate term of life without the possibility of parole (LWOP) on count 1 and a consecutive LWOP term on count 2. The court struck the sentence on the prior prison term. As relevant here, the court imposed and stayed a $240 parole revocation restitution fine pursuant to section 1202.45.

DISCUSSION

*I. CALCRIM No. 240*

Zepeda argues the trial court erred by failing to instruct the jury on the felony murder rule's logical nexus requirement. We disagree.

In *People v. Cavitt* (2004) 33 Cal.4th 187, 193 (*Cavitt*), the California Supreme Court clarified "a nonkiller's liability for a killing 'committed in the perpetration' of an inherently dangerous felony under . . . [the] felony-murder rule."

9

(*Cavitt, supra,* 33 Cal.4th at p. 193, fn. omitted.) The court held that, "in such circumstances, the felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit. The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction." (*Ibid*.) The court stated it is not enough the act resulting in death occurred at the same time as the felony because "the felony murder rule does not apply to nonkillers where the act resulting in death is completely unrelated to the underlying felony." (*Cavitt, supra,* 33 Cal.4th at p. 196.)

Furthermore, the *Cavitt* court explained the logical-nexus requirement is "not a separate element of the charged crime, but, rather, a clarification of the scope of an element." (*Cavitt, supra,* 33 Cal.4th at p. 203.) Hence, "if the requisite nexus between the felony and the homicidal act is not at issue and the trial court has otherwise adequately explained the general principles of law requiring a determination whether the killing was committed in the perpetration of the felony, . . . there is no sua sponte duty to clarify the principles of the requisite relationship between the felony and the homicide without regard to whether the evidence supports such an instruction. [Citation.]" (*Id*. at p. 204.) "When a legally correct instruction is requested, however, it should be given 'if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.' [Citation.]" (*People v. Wilkins* (2013) 56 Cal.4th 333, 347 (*Wilkins*).)

At the time of trial in March 2014, the bench notes to both CALCRIM Nos. 540B and 731 stated that if the evidence raised an issue of the causal connection between the felony and the killing, a trial court should instruct the jury with the following language: "There was a logical connection between the cause of death and the [underlying felony] . . . . The connection between the cause of death and the [underlying felony] must involve more than just their occurrence at the same time and place."

10

(Former CALCRIM Nos. 540B & 731 (2013 ed.), pp. 266-268, 471-474.)  The bench notes to both instructions also stated that if causation was at issue, a trial court should instruct the jury with CALCRIM No. 240.  (Former CALCRIM Nos. 540B & 731 (2013 ed.), pp. 267, 473.)

Preliminarily, we note that it does not appear from our review of the record the trial court ruled on Zepeda's request to instruct on the logical nexus requirement. When defense counsel requested the language on the logical nexus requirement, the discussion transitioned to CALCRIM No. 240, the instruction on proximate cause and independent intervening causation, and the trial court and the parties focused on that instruction.  The court's comments demonstrate that at least at that outset, it understood defense counsel was requesting two separate instructions.  When denying Zepeda's request, the trial court mentioned only CALCRIM No. 240.[1]  Defense counsel did not request the court rule on its request to instruct the jury on the logical nexus requirement. Counsel's failure to secure a ruling forfeits any appellate claim of error because there is no ruling to review.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 371.) Nevertheless, we will address the merits of Zepeda's claim.  (*People v. Turner* (1990) 50 Cal.3d 668, 708-709 [address merits to forestall ineffective assistance of counsel claim].)

In his opening brief, Zepeda asserts the trial court erred by not instructing the jury with the felony murder rule's logical nexus requirement.  However, he does not explain how the court erred or cite to any facts supporting the instruction.  Again, we may treat his argument as forfeited.  (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*) [issue forfeited where party fails to provide legal argument or citation to facts regarding sufficiency of evidence].)

---

[1]      Zepeda does not argue the court erred by failing to instruct the jury with CALCRIM No. 240.

In his reply brief, Zepeda asserts the jury could have concluded the purpose of the kidnapping was to recover the money and/or drugs and Sanchez's murder in fact interfered with that goal. That is not the test. The *Cavitt* court opined, "the felony-murder rule does not apply to nonkillers where the act resulting in death is *completely unrelated* to the underlying felony." (*Cavitt, supra,* 33 Cal.4th at p. 196, italics added.) Zepeda fails to identify any evidence adduced at trial that could support the theory Sanchez's murder was "completely unrelated" to the kidnapping. (*Cavitt, supra,* 33 Cal.4th at p. 196.) The primary goal of kidnapping Ortega was to find and kill Sanchez and Carranza.

Assuming for purposes of argument the trial court did err, we conclude Zepeda was not prejudiced. "When the jury is 'misinstructed on an element of the offense . . . reversal . . . is required unless we are able to conclude that the error was harmless beyond a reasonable doubt.' [Citations.]" (*Wilkins, supra,* 56 Cal.4th at p. 348.) "'In deciding whether a trial court's misinstruction on an element of an offense is prejudicial to the defendant, we ask whether it appears ""beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."""" [Citations.]" (*Id.* at p. 350.)

Here, any instructional error did not contribute to the jury's guilty verdict on count 1. Again, Zepeda does not explain how based on the facts he was prejudiced by the alleged error. (*Stanley, supra,* 10 Cal.4th at p. 793 [issue forfeited where party fails to provide legal argument].) The evidence at trial demonstrated that from the time the men left Taylor's home in Montebello to drive to Anaheim, the primary goal was to kill

Sanchez and Carranza. Thus, Zepeda was not prejudiced by any error in not instructing the jury on the logical nexus requirement.[2]

*II. CALCRIM No. 1202*

Relying on *Apprendi v. New Jersey* (2000) 530 U.S. 466, and its progeny. Zepeda contends the trial court erred in instructing the jury on count 2. Not so.

Section 209, subdivision (a), aggravated kidnapping, proscribes kidnapping "for ransom, reward or to commit extortion or to exact from another person any money or valuable thing." It states the punishment for "cases in which any person subjected to any such act suffers death or bodily harm, or is intentionally confined in a manner which exposes that person to a substantial *likelihood* of death" is LWOP. (Italics added.) It adds that the punishment "where no such person suffers death or bodily harm" is life with the possibility of parole.

The amended information alleged Zepeda "intentionally confined . . . Ortega in a manner which exposed . . . Ortega to substantial likelihood of death, and . . . Ortega suffered death or bodily harm."

As to count 2, the opening paragraph of CALCRIM No. 1202 stated, "The defendant is charged in [c]ount 2 with kidnapping for the purpose of ransom, or reward, or extortion or to extract from another person any money or valuable thing that resulted in exposure to a substantial *likelihood* of death, in violation of . . . section 209[, subdivision](a)." (Italics added.) After providing the required elements and principles of

---

[2] In discussing harmless error, the Attorney General asserts, "Finally, the instructions given informed the jury of the logical nexus requirement." Which instructions and how did they inform the jury? In the future, the Attorney General could do a better job citing to the applicable instructions and providing reasoned argument on the issue, or referring to the previous discussion. Moreover, when we referred to the record in an attempt to discern which instructions she was referring to, we found the record reference "(7 RT 112)" was incorrect. Volume 7 of the reporter's transcript includes pages 1063 to 1207. It is not the court's duty to comb through the record for support for the parties' claims.

asportation and consent, CALCRIM No. 1202 provided, "If you find the defendant guilty of kidnapping for ransom, or extortion, or to extract from another person any money or valuable thing you must then decide whether the People have proved the additional allegation that the defendant intentionally confined the kidnapped person in a way that created a substantial *risk* of death." (Italics added.) The court's instruction mirrored the form CALCRIM No. 1202. (Former CALCRIM No. 1202 (2013 ed.), pp. 952-953.) And the court's oral pronouncement of the instruction matched this language.

During closing argument, the prosecutor referred to a substantial "risk" of death numerous times. As relevant here, the jury's verdict form for count 2 stated, "We the jury find the sentencing fact to be TRUE that, . . . Zepeda intentionally confined the kidnapped person in a way that created a substantial *risk* of death." (Italics added.)

Likelihood is defined as a "probability." (Webster's 3d New Internat. Dict. (1981) p. 1310.) Risk is defined as "the possibility of loss, injury, disadvantage, or destruction." (Webster's 3d New Internat. Dict. (1981) p. 1961.)

The Attorney General concedes "likelihood" and "risk" have different meanings but asserts the correctness of jury instructions must be determined based on the entire charge. (*People v. Solomon* (2010) 49 Cal.4th 792, 822 [correctness of jury instructions determined from entire charge and not from consideration of parts of an instruction].)

Based on the entire charge, we conclude the use of the phrase "substantial risk of death" instead of "substantial likelihood of death" adequately conveyed to the jury that it had to determine the increase in the risk of death to Ortega was probable and not a mere possibility. A substantial possibility is virtually indistinguishable from a probability. Errors cannot be based on miniscule verbal inaccuracies in some parts of the instructions, and they may not be predicated on isolated phrases, sentences, or excerpts merely because they are open to criticism. (*People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1075.) Although the better practice may be to modify CALCRIM No. 1202's

14

sentencing language to read "substantial *likelihood* of death" we cannot say the inaccuracy is fatal here.

Assuming for purposes of argument the instruction was fundamentally flawed, we conclude Zepeda was not prejudiced by any error. Zepeda's claim the jury was not properly instructed on the sentencing provision exposing him to an LWOP sentence implicates the federal constitution because he was denied a jury trial on that provision.

The denial of the right to a jury trial on aggravating circumstances is reviewed under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). "Such an error is reviewed to determine whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citations.] The reviewing court must 'ask[ ] whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' [Citation.]" (*People v. Sandoval* (2007) 41 Cal.4th 825, 838 (*Sandoval*).) Thus, we must determine whether CALCRIM No. 1202's sentencing provision language would have read, "substantial likelihood of death," the jury would have found true the kidnapping sentencing provision. We conclude it would have.

After Zepeda and his confederates repeatedly threatened Ortega with bodily harm, including burning him to death, and impliedly threatened his family, Ortega told them where they could find Carranza and Sanchez. As we explain above, the men planned to kill Sanchez and Carranza and retrieve the stolen drugs. One of the men in the SUV had a handgun and Espinoza, who was in his truck, had a shotgun. Additionally, Sanchez and Carranza both had guns earlier that evening. When the SUV arrived at Carranza's home, two men got out and the SUV driver fired multiple rounds, killing Sanchez. Evidence of men threatening to kill Ortega by burning him alive while armed with a gun could certainly lead the jury to conclude death was probable and not merely possible. Based on this evidence, the jury could reasonably conclude Zepeda and his

15

confederates confined Ortega in a manner that exposed him to a "substantial *likelihood* of death." Indeed, they could hardly conclude otherwise.

### III. *Parole Revocation Restitution Fine*

Zepeda claims the trial court erred by imposing and suspending a parole revocation restitution fine pursuant to section 1202.45 because he was sentenced to life in prison without the possibility of parole. Again, we disagree.

Section 1202.45, subdivision (a), states: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of [s]ection 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of [s]ection 1202.4."

In *People v. Brasure* (2008) 42 Cal.4th 1037, 1075, (*Brasure*), defendant was sentenced to death and determinate prison terms on multiple counts under section 1170. The court explained that pursuant to section 3000, subdivision (a)(1), the determinate terms must include a period of parole. Pursuant to section 1202.45, a parole revocation fine was required. (*Brasure, supra,* 42 Cal.4th at p. 1075.) The court reasoned that although defendant was unlikely to serve any part of the parole period on his determinate sentence, nevertheless, "such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine." (*Id.* at p. 1075.)

Here, the trial court sentenced Zepeda to two indeterminate sentences, LWOP, on counts 1 and 2 to be served consecutively. However, the court also sentenced him to a consecutive six-year determinate term for count 3 and its accompanying enhancement. Count 3 carried with it a period of parole. As in *Brasure*, Zepeda is unlikely ever to serve any part of his parole period. Nevertheless, such a period was included in his sentence by law and carried with it a parole revocation restitution fine.

16

Therefore, based on *Brasure*, we conclude the trial court properly imposed the parole revocation restitution fine pursuant to section 1202.45.

DISPOSITION

The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.