Filed 5/19/26  P. v. McKane CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RYAN McKANE,<br><br>    Defendant and Appellant. | 2d Crim. No. B339385<br>(Super. Ct. No. KA128405)<br>(Los Angeles County) |

Ryan McKane appeals after a jury convicted him of first degree murder (Pen. Code[1], §§ 187, subd. (a), 189; count 1), two counts of resisting an executive officer (§ 69; counts 2 and 3), and two counts of battery upon a peace officer (§ 243, subd. (b); counts 4 and 5).  The jury also found true an allegation appellant personally used a deadly and dangerous weapon, a knife, in committing the murder (§ 12022, subd. (b)(1)).  The trial court sentenced appellant to a total term of 28 years and 8 months to life in state prison.

---

[1] Undesignated statutory references are to the Penal Code.

Appellant contends the evidence is constitutionally insufficient to sustain his conviction for first degree murder. We conclude substantial evidence supports a first degree felony murder conviction and will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Evidence*

Cleo Mondragon resided in her son's home along with four tenants, including appellant. Mondragon also rented a barn on the property to the victim Craig Young, whose girlfriend Kathy Rogers regularly stayed there.

On August 23, 2021, two days before the killing, Mondragon noticed jewelry was missing from her room. Mondragon told police that only appellant and Andrew Cattis, a bedridden tenant, were home when she left that day. The previous day, appellant had seen Mondragon remove her jewelry and place it on the dresser. Appellant asked if that was where she kept her jewelry, and Mondragon replied, "Yes, it's my room."

When Mondragon asked if appellant took her jewelry, he denied doing so. Previously, Mondragon had suspected another tenant, Dorothy Lua, of stealing other items in the house.

Mondragon called the police, who arrived hours later. An officer knocked on appellant's door, which opened. Appellant was not inside. Based on noise, Mondragon believed appellant was in the room when the police arrived. A window in the room's closet was broken with the glass on the ground outside.

On August 24, Mondragon found a pouch and dollar bills outside. Mondragon noticed "things being broken and turned backwards and upside down" in the house, and she had Young change her locks. She told Young she was going to leave, and

2

Young said he would watch the house. Mondragon locked her room before leaving.

Young's girlfriend, Rogers, testified that, on the morning of August 25, she awoke to Young coming up the stairs of his rental. Young was looking at a video monitor showing the home and said, "Oh, no" and indicated Mondragon's room had been broken into. Young headed downstairs, and Rogers followed. Young entered the house. When he exited, he told Rogers "to go back upstairs, get [her] phone and call 911 because [appellant] was destroying the property."

Rogers retrieved her phone to call 911 and then walked back toward the house. She saw appellant and Young in the living room, facing one another with "their arms and hands on their shoulders like sumo wrestlers would be." They were "stumbling around." Rogers heard Young say, "You fucking stabbed me." Appellant said, "And I'll fucking do it again."

Holding his stomach, Young walked with Rogers back to the rental. Young collapsed. Paramedics later took him to the hospital, where he died. A pathologist testified Young "died after being stabbed on the chest."

Corporal Megan Gonzalez issued announcements over loudspeaker for anyone inside the residence to exit. Two individuals did so. After about an hour, appellant exited. During his arrest, appellant kicked Corporal Gonzalez in her left thigh and spat in another officer's face twice.

Surveillance video shows appellant, at 6:02 a.m., break a window in Mondragon's door by throwing an object at it. At 6:17 a.m., appellant enters Mondragon's room. At 6:20 a.m., appellant exits the room with an item, which he places outside, before

3

returning to the room. At 6:24 a.m., a window curtain moves in the room of Migali Hernandez, another tenant.

At 6:29 a.m., the video shows Young standing by the house. At 6:35 a.m., Young walks into the house holding a cell phone in one hand and a black rubber hose in the other. At 6:36 a.m., Young exits the house and appears to direct Rogers to call the police. At 6:38 a.m., Young reenters the house. At 6:40 a.m., he exits the house holding his stomach with a large red spot on his shirt.

Appellant testified he had not been aware the police came to the house to investigate Mondragon's missing jewelry. On August 23, appellant was in the backyard smoking marijuana when Young "came at [him]" with a rubber hose. Appellant turned his bong upside down, and Young walked away. Then, inside the house, Hernandez's boyfriend said to appellant: "We're not playing with you; we know you're stealing."

Appellant called for his girlfriend to pick him up. When she dropped him off the next day, Mondragon said she was very disappointed because he was stealing from her.

The morning of August 25, appellant was lying in bed when he heard Young screaming his name. Appellant sat up to the edge of his bed. Young kicked the door open and hit appellant twice on the head with what appellant thought was a pipe. Young said, "I know you're stealing this is what thieves get." Appellant grabbed his knife from the nightstand to "scare [Young] off . . . ."

Young pushed appellant into the living room, where they struggled for the knife. Young "made" appellant cut the inside of his own forearm. Appellant believed Young was stabbed when Young pulled the knife as appellant held it out a "little bit."

4

Young backed up and said, "All right, I get it." His shirt was turning red with blood. Appellant did not force the knife forward.

When confronted with video of himself throwing an item at Mondragon's window and entering her room, appellant could not recall doing so and could not explain his behavior. Nor could he recall rummaging through her drawers, pulling something out, and placing it outside.

*Stipulations*

The parties entered into numerous stipulations regarding forensic evidence. A sample from the knife handle showed very strong support that appellant was a contributor and limited support Young was a contributor. A sample from the rubber hose showed very strong support that appellant and Young were both contributors.

DISCUSSION

"Appellant contends that the evidence is insufficient to support a first degree felony murder verdict." First, he "maintains the evidence is insufficient to show the required intent" for burglary. Second, appellant argues the People failed to prove he had not reached a place of temporary safety. We conclude the evidence was sufficient.

"All murder . . . that is committed in the perpetration of, or attempt to perpetrate, . . . burglary . . . is murder of the first degree." (§ 189, subd. (a).) "The crime of burglary consists of an act—unlawful entry—accompanied by the 'intent to commit grand or petit larceny or any felony.'" (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041.)

"Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the

felony and murder were part of one continuous transaction." (*People v. Young* (2005) 34 Cal.4th 1149, 1175 (*Young*).) "'A killing committed by a [burglar] during his or her flight from the scene of the crime, and before reaching a place of temporary safety, comes within section 189.'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 341.) This principle, denominated the "escape rule," establishes the "'outer limits of the "continuous-transaction" theory'" when the killing occurs during flight. (*Id*. at p. 345.)

To assess the evidence's sufficiency, "'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.'" (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

Substantial evidence supports the conclusion that appellant intended to commit theft. "'Reliance on circumstantial evidence is often inevitable when . . . the issue is a state of mind such as'" intent. (*People v. Lewis* (2001) 26 Cal.4th 334, 379.) Here, appellant broke into and entered Mondragon's room when she was not present. Video showed him rummaging through drawers, behavior consistent with a desire to locate valuables. Appellant even agreed he removed an item from the drawer and placed it outside. Moreover, the evidence indicated he stole

Mondragon's jewelry just two days prior. Appellant had asked about the jewelry's location, was the only able-bodied person home when the jewelry went missing, and fled through a window when the police arrived. The prior theft supported an inference appellant likewise intended to commit theft on the day of the killing. (Evid. Code, § 1101, subd. (b).) Viewing the record in the light most favorable to the judgment, the jury could have reasonably found the requisite intent for burglary.

Appellant's reliance on *In re Leanna W.* (2004) 120 Cal.App.4th 735 is misplaced. That case involved a juvenile who hosted an unauthorized party at her grandmother's home. The presence of other partygoers confounded the conclusion that the juvenile herself consumed alcohol, which could have supported an inference the juvenile intended to commit theft. (*Id*. at p. 741.) Here, by contrast, appellant's conduct in Mondragon's room on the day of the killing cannot reasonably be attributed to anyone else, and the evidence of his prior theft illuminates his subsequent intent.

The record also contains substantial evidence that the burglary and killing were part of one continuous transaction. Strong temporal and causal relationships existed between the burglary and killing. Fewer than 25 minutes elapsed between appellant's entry into Mondragon's room and the stabbing. (Cf. *People v. Johnson* (1992) 5 Cal.App.4th 552, 560 [fact that victim killed 30 minutes after robbery did not preclude finding homicide occurred in its commission].) And the burglary of Mondragon's room played a significant role in Young's ultimately fatal confrontation of appellant.

Although appellant argues he reached a place of temporary safety, the jury could have reasonably concluded otherwise. Not

only was appellant in the same home at the time of the fatal stabbing (cf. *Young, supra,* 34 Cal.4th at p. 1177 ["'[t]he scene of a robbery is not a place of temporary safety'"]), he had no key to his room because the door did not "shut all the way" and could "easily" be pushed open.  The jury could have rationally determined appellant's unsecured room mere feet from the room he burglarized was not a place of temporary safety.

Appellant argues the People "should not be permitted to argue that his room was separate from the house as proof of a burglary, but that his room was part of the house as proof that it was not a place of temporary safety."  However, the two inquiries are conceptually distinct.  No logical inconsistency exists in finding both that appellant unlawfully entered Mondragon's room and that he failed to reach a place of temporary safety when he went to his room.  (See *People v. Russell* (2010) 187 Cal.App.4th 981, 991 ["[T]he ultimate question of whether the defendant has reached a place of temporary safety is an objective one to be determined by the trier of fact."].)

Appellant also argues "the evidence is insufficient to sustain a first degree premeditated murder conviction."  Even if we assume insufficient evidence supported this theory, appellant's conviction remains valid.  "Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground."  (*People v. Marks* (2003) 31 Cal.4th 197, 233.)  Here, it cannot be determined on which ground the jury relied, and there is no affirmative indication the jury relied on a premeditated, willful, and

8

deliberate murder theory.  Because there was sufficient evidence as to the felony murder theory, reversal is unwarranted.[2]

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P. J.

BALTODANO, J.

---

[2] The California Supreme Court recently decided *People v. Morris* (May 4, 2026, S284751) ___ Cal.5th ___ [2026 Cal.Lexis 2322].  Because appellant was not convicted as an aider and abettor, *Morris* does not impact the resolution of his case.

9

Rogelio Delgado, Judge
Superior Court County of Los Angeles

_____

Kathy R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Blake Armstrong, Deputy Attorney General, for Plaintiff and Respondent.